[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-15611

_____

D.C. Docket No. 8:14-cv-01196-VMC-TBM

PATRICIA JUANITA WATE,
individually and as personal representative of the
Estate of James Clifton Barnes, Deceased,

Plaintiff-Appellee,

versus

KENNETH KUBLER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(October 12, 2016)

Before MARCUS and WILLIAM PRYOR, Circuit Judges, and DAVIS,* District
Judge.

_____

* Honorable Brian J. Davis, United States District Judge for the Middle District of
Florida, sitting by designation.

DAVIS, District Judge:

James Clifton Barnes and his aunt Paula Yount went to the beach to conduct a baptismal ritual.  While in the water, Barnes became agitated.  After Barnes was pulled out of the water and, following a struggle, he was handcuffed and pinned on the beach by two law enforcement officers.  He was then "tased" five times, and at least two of those tases occurred after Barnes had ceased resisting.  Barnes died two days later.  The district court denied Pinellas County Deputy Sheriff Kenneth Kubler's motion for summary judgment seeking qualified immunity, determining that Kubler's use of the Taser gun amounted to an unconstitutional use of excessive force in violation of the Fourth Amendment, that was clearly established at the time. Because the record evidence, construed in favor of Plaintiff, demonstrates that Barnes was not a flight risk or a threat to the safety of the officers or the public prior to the conclusion of the tasings, we affirm.

## I.  Background

### A.  The Tasing

The incident giving rise to this action occurred at midday on March 17, 2012, at the north end of Honeymoon Island State Park, located in Pinellas County, Florida.  Honeymoon Island is a 400-acre barrier island with four miles of beach, located in the Gulf of Mexico off of the west coast of Florida, and is accessible via

2

a causeway.  While in the water with his aunt, Barnes began acting erratically by flailing, flopping, and thrusting his arms and body, and yelling loudly about a demon.  Barnes was a big man, standing at 5 feet 10 inches tall, and weighing 290 pounds.  Barnes' conduct drew attention on the crowded beach.  The rapidly unfolding facts in this case are framed by a stipulated timeline, and painted by the testimony of sixteen witnesses.

Officer Joseph Tactuk of the Florida Department of Environmental Protection, was the only law enforcement officer on Honeymoon Island that day. Tactuk stopped his All Terrain Vehicle ("ATV") when he saw Barnes, and Yount left the water to speak to the officer.  Barnes did not comply with Tactuk's and Yount's admonitions to calm down and leave the water.  Tactuk entered the water and ordered Barnes out of the water, believing that he had probable cause to arrest Barnes for battery on Yount.  A struggle ensued and Tactuk repeatedly struck Barnes in the face.  Barnes continued to physically resist, and Tactuk repeatedly ordered Barnes to cooperate.

Tactuk got Barnes to the shallow water and placed a handcuff on one of Barnes' hands.  Barnes pulled Tactuk into waist-deep water, and Tactuk hit Barnes in the face with his fist while the two continued to struggle.  Tactuk placed Barnes in a choke hold around the neck, and dragged Barnes out of the water by the head,

3

assisted by a bystander.  Barnes was yelling for help and pleading for the officer to "Please stop," as Tactuk continued to hit him.  Tactuk broadcast his call sign over the police radio at 12:30:52 p.m., and two bystanders who witnessed the struggle called 911 at 12:31 p.m.

Barnes was eventually pulled from the water at approximately 12:35:24, and at 12:35:53 p.m., a bystander reported to 911 that it looked as though Barnes had "calmed down," and was "just laying on the beach now with the state park ranger next to him."  Tactuk kneeled beside Barnes on the beach and tried to secure Barnes' other arm in the handcuffs, but was unsuccessful because Barnes was resisting and not cooperating.  Tactuk got on top of Barnes and hit him, as he attempted to place Barnes' other arm in the handcuffs.

Three bystanders assisted Tactuk in placing the handcuff on Barnes' second arm, holding Barnes' legs and positioning Barnes' free arm, as Barnes continued to resist, and to loudly grunt and growl.  The handcuff was not placed on Barnes' second arm in the normal fashion, and instead, one of Barnes' arms was pulled over his head, with his elbow pointing toward the sky, and his other arm was twisted behind his back, in a manner that looked like a figure-eight.  One bystander observed that an "eruption of blood and fluids" spewed from Barnes' mouth with each breath, and that Barnes was struggling to breathe.

4

At this point, Tactuk got off of Barnes and pulled him further up onto the shore, and then straddled him while Barnes continued to resist.  Tactuk pressed the emergency button on his radio at 12:36:09 p.m., identified himself, and said that he had a violent, mentally-ill person in custody.  Tactuk broadcast that he needed "help" at the north end of the island, and that the location was accessible only by ATV.  As Barnes continued to struggle, Tactuk deployed pepper spray, shooting it into Barnes' eyes.  Tactuk struck Barnes in the face multiple times, and Barnes continued to resist.

Officer Kubler, who was assigned to the Sheriff's Marine Unit, responded to the dispatch call.  As he got closer to the scene, he eventually saw Tactuk and Barnes struggling on the beach.  Kubler radioed that he had arrived, ran his boat aground, and jumped off boat at 12:36:59 p.m.  Kubler observed that the officer on the scene had "somebody on the ground."

When Kubler arrived, Barnes was on his back with his face out of water, struggling to get Tactuk off of him.  Barnes had blood on his mouth and face and Tactuk was covered in blood.  Tactuk was straddling Barnes, sitting on Barnes' stomach with his knees pinned under Barnes's armpits, and Barnes was screaming and yelling.  One eyewitness said he thought that Barnes was starting to "wear down at that point" and that "he wasn't fighting as much," and that the situation was

5

"under control." Kubler positioned himself between Barnes's hips and knees and tried to stop Barnes from kicking, instructing Barnes to quit resisting.

Starting at 12:37:37 p.m., Kubler and Tactuk radioed dispatch requesting other units and an ambulance. Kubler also reported over the radio that transporting Barnes would be problematic. Tactuk requested hobble restraints. Barnes can be heard yelling and screaming on the radio transmissions, and Tactuk can be heard on the dispatch call at 12:41:49 saying "stop resisting."

Kubler and Tactuk rolled Barnes onto his stomach in an attempt to position the handcuffs correctly, as Barnes resisted and kicked. Tactuk continued to hit Barnes, striking him in the face three times after Barnes bit Tactuk's hand. Witnesses said that Kubler stood over Barnes and put his foot on Barnes's buttocks, and one testified that Barnes was arching his back. Another witness testified that Kubler put his knee on Barnes's back, and that Barnes was immobilized.

Kubler warned Barnes to stop raising up or the officer would tase Barnes, but Barnes continued to resist. Kubler drew the Taser and gave Barnes a second warning, but Barnes kept struggling, and at 12:43:18 p.m., he can be heard again yelling in the background on the dispatch radio transmission.

Seventeen seconds later, at 12:43:35 p.m., Kubler deployed his Taser, and the probes struck Barnes in the mid-back, 2.95 inches (7.5 centimeters) apart. Six and a

6

half minutes had passed between Kubler's arrival on the beach and his deployment of the Taser.  Kubler activated the Taser on Barnes a total of five times for 5, 3, 5, 4, and 5 seconds respectively, over a nearly two-minute period (12:43:35; 12:43:49; 12:44:20; 12:44:43; and 12:45:17).  The intervals between deployments were 9, 28, 18 and 30 seconds respectively.

Kubler radioed dispatch at 12:45:26, but the transmission was unintelligible. Kubler and Tactuk uncuffed Barnes and attempted to position the handcuffs properly, and at this time, Barnes was still and had become quiet.  An off-duty fire lieutenant ran to the scene, observed that Barnes appeared to be blueish gray, and told the officers "You need to get the handcuffs off him because he's not breathing." J. Hutzler (Supp. App. 8).  The officers uncuffed Barnes, turned Barnes over to his back and began CPR.  The officers had to do chest compressions "[b]ecause of all the face trauma, we couldn't get an airway on him." J. Hutzler (Supp. App. 10).  A radio transmission reflects that by 12:46:37, rescue personnel had been called. Rescue personnel arrived on an ATV and took over the rescue.

Barnes died two days later.  The Medical Examiner found the cause of death to be complications of asphyxia with contributory conditions of blunt trauma and restraint.  Barnes had scattered abrasions, contusions, and lacerations, plus subgaleal hemorrhage and cerebral edema.  A pair of puncture marks were on his

7

back.

## B. Procedural History

Barnes' personal representative Patricia Juanita Wate ("Plaintiff") brought suit against the two officers individually, the Sheriff in his official capacity, the Florida Department of Environmental Protection, and the Florida Fish and Wildlife Conservation Commission. The Sheriff removed the action to the United States District Court for the Middle District of Florida, in Tampa. Following announcement that the state agencies and Tactuk had settled with Plaintiff, those claims were dismissed. The district court then bifurcated Plaintiff's claims against Kubler and the Sheriff. Count II of Plaintiff's Fourth Amended and Recast Complaint, which is the operative complaint, is brought against Officer Kubler pursuant to 42 U.S.C. § 1983, and alleges that Kubler violated the Fourth Amendment of the United States Constitution by using excessive force. Officer Kubler moved for summary judgment based on qualified immunity. The district court denied Kubler's motion for summary judgment, and Kubler timely appealed.

## III. Standard of Review

The Court has jurisdiction over the interlocutory appeal of the denial of qualified immunity as a collateral order under 28 U.S.C. § 1291. Wilkerson v. Seymour, 736 F.3d 974, 977 (11th Cir. 2013) (citing Mitchell v. Forsyth, 472 U.S.

8

511, 530 (1985)).  We review *de novo* a district court's denial of qualified immunity at summary judgment, and apply the same legal standards as the district court. Wilkerson, 736 F.3d at 977 (11th Cir. 2013); Draper v. Reynolds, 369 F.3d 1270, 1274 (11th Cir. 2004).  We resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts.  Draper, 369 F.3d at 1274. "[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'"  Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  We do not weigh conflicting evidence or make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment.  Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir.1996); see also, e.g., Strickland v. Norfolk S. Ry. Co., 692 F.3d 1151, 1154 (11th Cir. 2012) ("'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when] ruling on a motion for summary judgment . . . .'" (quoting Anderson, 477 U.S. at 255)).

## IV.   Discussion

9

A. Qualified Immunity

"Qualified immunity shields government officials from liability for civil damages for torts committed while performing discretionary duties unless their conduct violates a clearly established statutory or constitutional right." Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008).  To decide whether a defendant is entitled to qualified immunity we engage in a two-part inquiry.  The defendant must first establish that he acted within the scope of his discretionary authority when the allegedly wrongful acts occurred.  If he did, as in this case, the burden shifts to the plaintiff to demonstrate that the defendant violated a constitutional right that was clearly established at the time, see, e.g. Brooks v. Warden, 800 F.3d 1295, 1306 (11th Cir. 2015); Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002), or in rare circumstances, that the conduct was so obviously prohibited by the Fourth Amendment that the constitutional violation would be readily apparent to the officer with "obvious clarity."  Fils v. City of Aventura, 647 F.3d 1272, 1291-92 (11th Cir. 2011).  To determine whether a right was clearly established, we look to binding decisions of the Supreme Court of the United States, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state, here the Florida Supreme Court.  See McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007).  Based on these decisions, we ask "'whether it would be clear to a

10

reasonable officer that his conduct was unlawful in the situation he confronted.'" Terrell v. Smith, 668 F.3d 1244, 1255 (11th Cir. 2012) (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001), overruled in part by Pearson v. Callahan, 555 U.S. 223, 234-36 (2009)). We may decide these two issues in either order, but to survive Kubler's assertion of qualified immunity, the Plaintiff must make both showings that Kubler's alleged conduct was unconstitutional, and that the state of the law at the time was clearly established so as to provide "fair warning" to Kubler that such conduct was unconstitutional. See Tolan, 134 S.Ct. at 1866; Maddox v. Stephens, 727 F.3d 1109, 1120-21 (11th Cir. 2013).

When considering qualified immunity on a defendant's motion for summary judgment, we consider the record in the light most favorable to the plaintiff, eliminating all issues of fact. "'By approaching the record in this way, the court has the plaintiff's best case before it. . . . [M]aterial issues of disputed fact are not a factor in the court's analysis of qualified immunity and cannot foreclose the grant or denial of summary judgment based on qualified immunity[.]'" Penley v. Eslinger, 605 F.3d 843, 848 (11th Cir. 2010) (quoting Robinson v. Arrugueta, 415 F.3d 1252, 1257 (11th Cir. 2005)). "[O]nce we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of the officer's actions is a pure question of law."

Penley, 605 F.3d at 848-49 (internal quotations and emphasis omitted).

### B.  Constitutional Violation

When a plaintiff alleges excessive force during an arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures.  Tolan, 134 S.Ct. at 1865.  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Graham v. Connor, 490 U.S. 386, 396 (1989) (internal quotation marks and citation omitted).

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of a precise definition or mechanical application, [citation omitted], . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Id. (citing Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)).  We are charged with examining "the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balanc[ing] the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate."  McCullough v. Antolini, 559 F.3d 1201, 1206 (11th Cir. 2009) (citing

12

Scott v. Harris, 550 U.S. 372, 383 (2007)).  "Although some amount of force is generally needed to subdue a suspect, the amount used must be reasonably proportionate to the need for force."  Smith v. LePage, __ F.3d __, 2016 WL 4473223, at *5 (11th Cir. August 25, 2016) (citing Lee, 284 F.3d at 1197-98); see also Scott, 550 U.S. at 383 (observing that in determining whether the Fourth Amendment was violated, "we must still slosh our way through the factbound morass of 'reasonableness.'").  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation."  Graham, 490 U.S. at 396-97.  We make this inquiry without regard to the officer's underlying intent or motivation.  Id. at 397.  "Officers may use force that is 'necessary in the situation at hand.'"  Fils, 647 F.3d at 1288 (citation omitted).  However, "[r]easonableness cuts both ways . . . .  At summary judgment, we cannot simply accept the officers' subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances."  Id. (citing Vinyard v. Wilson, 311 F.3d 1340, 1347-48 (11th Cir. 2002)).

The critical time period for purposes of determining whether Officer Kubler's

13

use of the Taser on Barnes constituted unconstitutional excessive force spans two minutes, from 12:43:18, just before the first activation when Barnes can be heard yelling, through 12:45:17 p.m., the time of the fifth Taser deployment. While witness accounts of what happened vary, several witnesses testified that Barnes had stopped resisting and had become still during this time period.

One witness stated that Barnes was not moving when Kubler approached the scene. "I know Mr. Barnes wasn't moving. But he [Tactuk] like, lifts Mr. Barnes up and begins punching him again. And then he - the ATV officer [Tactuk] tells the marine officer [Kubler] to Tase him." S. Richardson (Supp. App 79); see also S. Richardson (App. 1792-93 (Q: "Right before Mr. Barnes was Tased by the marine officer, was Mr. Barnes making any movement that you could see? [A:] Not that I recall. I don't believe so."). A second witness responded to questions as follows:

> Q:    At the point in time when Mr. Barnes was Tased, right before that, do you remember seeing any movement by Mr. Barnes at that time before he was Tased?
>
> A:    No.

B. Szenay (App. 1704). Another witness said that he saw "very minimal" body movements by Barnes after Kubler arrived at the scene. "I didn't see a lot of movement other than maybe floundering feet around a little bit." J. Hutzler (Supp.

14

App. 7); see also J. Hutzler  (App. 1256).  Another witness testified:

> A:     He was still face down and the DEP officer
> [Tactuk] had control of him, but he wanted to like raise
> up or move or whatever.  And it appeared that they
> wanted submission and they weren't going to get it.
> . . .
>
> I didn't see anything out of the ordinary.  Actually,
> at that point he was more submissive than any, because he
> was so wore out. . . .
>
> Q:     Was his leg flailing around or moving around?
>
> A:     No.
> . . .
>
> Oh, he tried to get up, yeah.
> . . .
>
> No [the handcuffs] weren't [in the normal position].
>  And the only way he [Barnes] could have gotten up is to
> like roll over and do a swing move to get up and all that,
> so . . .  He was face down.  So they [the officers] would
> have had no problem at all.

C. Szenay (Supp. App. 30-31).  Kubler had warned Barnes to cooperate or be tased,

and then Kubler "went straight for the taser."  Id. at 29-31.  And yet another witness

testified he saw Barnes struggling and kicking as Kubler was by Barnes' side

holding Barnes' head on the ground, and observed that Barnes was kicking his legs

when Kubler gave two warnings and shot the Taser.  After the second tasing,

however, "Mr. Barnes went stiff, stopped moving, and then a second later, started

15

kicking his legs again.  And then all of a sudden, just stopped kicking, stopped moving, stopped doing everything. . . .  Mr. Barnes was not moving at all.  And the marine officer [Kubler] tased him again," and then tased Barnes a fourth time.  J. Esposito (App. 964).

We have held that noncompliance or continued physical resistance to arrest justifies the use of force by a law enforcement officer.  See Draper, 369 F.3d at 1278 (holding that the use of Taser to effectuate an arrest did not constitute excessive force when the suspect repeatedly refused to comply with the officer's verbal commands).  However, "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force."  Hadley, 526 F.3d at 1330; see also Lee, 284 F.3d at 1200 (holding that once an arrest has been fully secured and any potential danger or risk of flight vitiated, a police officer cannot employ severe and unnecessary force).

Construing the evidence in favor of Plaintiff, the unambiguous facts are that Barnes was no longer resisting at least after the first two tasings, and that Kubler's further use of the Taser was wholly unnecessary, and grossly disproportionate to the circumstances.  Kubler had arrived on the scene six and a half minutes earlier, found Barnes bleeding from the face and observed Tactuk striking Barnes multiple times.  The two officers immobilized Barnes face down on the sand.  Barnes had no

16

weapon and was awkwardly handcuffed, which, drawing inferences from the facts in a light favorable to Plaintiff, had a greater than normal effect of further neutralizing Barnes.  The record establishes that while the first or maybe even the second Taser deployment may have been warranted, there is competent unambiguous evidence that by the third tasing, Barnes was handcuffed, immobile and still, such that a reasonable officer in Kubler's position would conclude that Barnes did not present a risk of flight, or a threat of danger to the officers or to the public.  Under these circumstances, further shocks were unnecessary and grossly disproportionate, and a jury could find that Kubler's use of a Taser on Barnes five times was unreasonable force.

To be sure, Kubler and Tactuk both testified that Barnes continued to resist violently throughout all of the tasings, and other witnesses agreed that Barnes was still rising up, kicking, struggling and refusing to comply with the officers' commands.  As noted by the Supreme Court in a similarly charged and disputed excessive force case, "[t]he witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases.  It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system."  Tolan, 134 S.Ct. at 1868.  We are tasked at this summary judgment stage not with weighing the evidence, making credibility choices or determining the truth of the

17

matter, but with deciding whether there is a genuine issue for trial, viewing the evidence and making reasonable inferences in the light most favorable to Plaintiff. See id., at 1866, 1868.

C.    Clearly Established

A reasonable officer in Kubler's position and under these circumstances would have had fair warning that repeatedly deploying a Taser on Barnes, after he was handcuffed and had ceased resisting, was unconstitutionally excessive. In Lee, 284 F.3d 1188, we found that the officer who arrested a female motorist for a horn-honking offense, was not entitled to qualified immunity on summary judgment when he slammed the head of the non-resisting arrestee against the trunk of her car, after pulling her from the vehicle and handcuffing her. We held that based on the plaintiff's account of the facts, "it is abundantly clear" that the officer used force that was "plainly excessive, wholly unnecessary, and, indeed, grossly disproportionate under Graham." 284 F.3d at 1198.    At this point, after the plaintiff had been arrested and secured in handcuffs, she "posed no threat at all to the officer or to anyone else and no risk of flight," making the officer's use of force "unnecessary and disproportionate." Id.

Thereafter, in 2008, we held that an officer who punched an arrestee in the stomach while the arrestee was handcuffed and not struggling or resisting, was not

18

entitled to summary judgment on qualified immunity from the arrestee's § 1983 excessive force action. Hadley, 526 F.3d at 1330. In Hadley, the arrestee had entered a grocery store and was yelling and creating a commotion while high on cocaine. Two officers arrested the plaintiff for resisting arrest with violence, and handcuffed him while still in the store. Id. at 1327-28. Though the plaintiff and the officers gave differing accounts of what happened next, we construed the facts in the plaintiff's favor on the officers' motions for summary judgment, finding that the officer punched the arrestee in the stomach after he was handcuffed and was not struggling or resisting. Id. at 1330. We held that after being handcuffed, the plaintiff "neither resisted arrest nor posed a danger to [the officer] sufficient to warrant a blow to the stomach. Thus [the officer] was not entitled to use force at that time." Id.

In 2009, this Court considered the reasonableness of an officer's repeated use of a Taser on an individual who was not accused of any crime; was not belligerent or aggressive or a risk of flight, and did not pose an immediate threat to the officer or others. Oliver v. Fiorino, 586 F.3d 898, 902, 906 (11th Cir. 2009). The officer in Oliver deployed a Taser multiple times, even after the individual was "immobilized," "limp," and "writhing in pain." Id. at 908. Under those circumstances, we held that the officer was not entitled to qualified immunity

19

because the force used was "so plainly unnecessary and disproportionate that no reasonable officer could have thought that this amount of force was legal under the circumstances." Id. See also Slicker v. Jackson, 215 F.3d 1225, 1233 (11th Cir. 2000) (Crediting unambiguous testimony that after plaintiff was arrested and handcuffed, officers repeatedly hit arrestee's head on the pavement, kicked him, and knocked him unconscious, "suggests the officers used excessive force in beating Slicker even though he was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way.").

In light of this precedent, a reasonable officer in Kubler's position would have had fair warning that repeatedly tasing Barnes after he was handcuffed and had ceased struggling and resisting was unreasonable under the Fourth Amendment. Kubler is not entitled to qualified immunity on Plaintiff's excessive force claim at this stage of the proceedings.

## V. Conclusion

The facts, when viewed in the light most favorable to Plaintiff, demonstrate that Officer Kubler's multiple tasings of Barnes, after an arrest had been fully secured and any potential danger or risk of flight eliminated, violated Barnes' clearly established constitutional right to be free from excessive force. For this reason, we **AFFIRM** the order of the district court denying Officer Kubler's motion

20

for summary judgment on qualified immunity grounds.