[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-11742

_____

D.C. Docket No. 1:15-cv-01834-RWS

JOHN DANIEL BLUE,

Plaintiff - Appellant,

versus

MARIA DEGUADALUPE LOPEZ,
a DFACS caseworker, in her individual capacity,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 28, 2018)

Before ROSENBAUM and JILL PRYOR, Circuit Judges, and BARTLE,[*] District
Judge.

ROSENBAUM, Circuit Judge:

_____

[*] Honorable Harvey Bartle III, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

We can't tell what time it is by measuring yards.  We can't know how much something weighs by measuring lightyears.  We can't see how long a field is by measuring degrees of heat.  And we can't quantify rainfall by measuring it on the Richter magnitude scale.  That's because in all of these cases, the measuring device simply is not designed to gauge the thing we are trying to measure.

Here, we must decide whether a legal measuring device—the standard for denying a motion for directed verdict in a Georgia criminal trial—can accurately gauge whether another legal standard—the propriety of granting summary judgment to a defendant in a 42 U.S.C. § 1983 malicious-prosecution case—has been satisfied.  Georgia's *Monroe* Rule dictates that denial of a motion for directed verdict in a criminal trial conclusively demonstrates the existence of probable cause, thereby precluding a state civil malicious-prosecution claim based on the prosecution in which the criminal court denied the directed verdict.  The district court here applied the *Monroe* Rule to grant summary judgment to Defendant-Appellee Maria Lopez, a case manager and investigator with the Georgia Department of Family and Child Services ("DFACS"), and against Plaintiff-Appellant John Blue on his § 1983 malicious-prosecution claim.

For the reasons we explain below, we conclude that was error.  The denial of a directed verdict in a criminal trial does not measure what matters in evaluating on summary judgment in the §1983 case whether probable cause for a prosecution

2

existed: the credibility, reliability, and quality of evidence supporting the prosecution in the first place. We therefore now vacate the entry of summary judgment and remand for further proceedings consistent with this opinion.

## I.

## A.

This case arises from an incident involving Blue and Lopez. At the time of the incident, Blue lived with his girlfriend Zstanya Patrick and their two sons, who were 14 and 10 years old.

DFACS received a complaint alleging domestic violence at the Patrick residence. So on the morning of June 12, 2014, Lopez went to Patrick's apartment to investigate. When Lopez arrived, she was driving a car that DFACS had provided for use in her job. Because of a medical condition, Lopez was using an intravenous ("IV") catheter, which was located on her arm.

After Lopez parked, she went to the front door, and Patrick answered. Lopez asked her to step outside to speak with her. Patrick complied.

During their conversation, Patrick admitted that domestic violence had occurred in the home. Patrick said that she and Blue did not get along, and she described a recent incident where Blue had hit one of the children, causing the child to complain of ringing in his ear. When Lopez asked Patrick what she intended to do about the situation, Patrick explained that she was going to separate

3

from Blue and move with her sons to Ohio. But Patrick had not made any specific plans about a timeframe for moving.

While the two women spoke, Blue arrived at the apartment. As Blue approached, Patrick asked Lopez to change the subject.

Blue did not address the two women when he entered the home. According to Blue, he did not know of Lopez's official capacity when he saw Patrick and Lopez speaking together. Instead, Blue stated that he believed that Lopez, whom he later described as appearing disheveled, was a "drug addict" friend of Patrick's. He claimed to base his belief on what he described as Lopez's flushed face and on his alleged observation of the IV dangling from her arm.[1]

Once Blue entered the apartment, he found his sons and told them to get dressed while he went out. Blue then left the apartment.

In the meantime, Lopez became concerned about Patrick's lack of a specific plan to remove the two children from the alleged domestic violence occurring in the home. So she returned to her car to call her supervisor and discuss the problem. Lopez's supervisor instructed Lopez to contact the Juvenile Court so she could take further action.

---

[1] Lopez denied that the IV was visible, instead stating that it was covered by a "band." She did tell Patrick about the IV because she used it as an excuse for declining to enter Patrick's home, since it smelled of smoke.

4

Lopez did just that. Once she reached the Juvenile Court by phone, a judge there granted Authorizations for Protective Custody ("Authorizations") for the children. The Juvenile Court then emailed Lopez the Authorizations, which permitted her, on behalf of DFACS, to take Blue's sons into custody.

At about this time, Blue, who had left the apartment a few minutes earlier, returned for his children. According to Blue, when he arrived at the apartment, he did not see Lopez because, he later reasoned, she was in her car speaking with her supervisor and the Juvenile Court. Blue went into the apartment, waited for the children to get dressed, and then left the apartment with the children.

As Lopez continued to sit in her car, Blue emerged from the apartment with his sons. The three entered Blue's van, which was parked head-in in the parking space directly across from and in front of Lopez's car, which was backed in and therefore facing the back of Blue's van. An eight-to-ten-foot-wide lane of travel separated the two vehicles.

Blue and his children entered the van and prepared to back out of the parking space. Lopez did not want the children to leave because DFACS had custody of them under the Authorizations issued by the Juvenile Court.

In Blue's version of the facts, as he prepared to back out of his parking spot, Lopez approached the van, beat on the driver's side window and told him he could

not leave with the children.  Blue simply said, "No," and began backing out of the parking space.

What happened next is hotly disputed by the parties.  According to Blue, as he was backing out, Lopez ran to her car and deliberately drove it into the back of Blue's van.  But Lopez claimed that it was Blue who struck her vehicle:  Lopez asserted that she pulled her car up behind the van to prevent Blue from leaving with the children, but she did not strike his van.  Rather, after she got close and had already stopped moving, Blue then backed into her.

Blue claimed that after the two cars collided, Blue got out of his van and asked Lopez to move her vehicle, but she did not respond.  At the time, Blue said, he thought Lopez looked "high" and "crazy as heck," and his only interest was getting his children away from Lopez.

So when Lopez refused to move her car, Blue returned to his van and began driving it backward and forward multiple times until he was able to leave the parking space.  Blue later claimed that he succeeded in leaving without hitting Lopez's car, though even later, he conceded that he used his van to "push" off Lopez's car.

Lopez had a different take on the incident.  She said that Blue rammed her vehicle with his van until he had successfully pushed her car out of the way and was able to maneuver the van out of the parking space.  After Blue left the

6

apartment complex with his children, Lopez called 911 to report the incident, prompting police to arrive on the scene and speak with Lopez.

Lopez later went to the Duluth Police Department to give a statement to police. In her statement, Lopez reported that Blue rammed her car as he was leaving the parking lot. As Lopez described the incident, Blue "continued backing into her vehicle until he had created a space where he could flee with his vehicle and both juveniles."

An officer then asked the Georgia Bureau of Investigation to issue a statewide alert for the children. And the officers who spoke to Lopez asked if she wanted to press charges against Blue. Lopez called her supervisor at DFACS, who told Lopez to press charges.

At some point, Blue saw the police alert on television and, after asking his parents to pick up the children, turned himself in. Once at the Duluth Police Department, Blue spoke with the lead investigator. Blue told the investigator that, after he and the children entered the van and as he was backing up, Lopez drove her car into the back of his van. Following the initial impact, Blue said he hit the gas, pushed her car off, and left. He told the detective that if he hit Lopez's car with his van, it was because he was trying to get out of the parking space.

The police ultimately arrested Blue, and an indictment was returned against him on a single charge of aggravated assault in violation of O.C.G.A. §16-5-

21(a)(2).  The Superior Court of Gwinnett County held a jury trial on the charge. At the close of the government's evidence, Blue's attorney moved for a directed verdict.  The court denied the motion for directed verdict.  Then the case proceeded to the jury, and it returned a verdict of not guilty.

**B.**

Following his acquittal, Blue filed a lawsuit against Lopez asserting, among other things, a Fourth Amendment malicious-prosecution claim under 42 U.S.C. § 1983.[2]

In the course of the proceedings, Lopez moved for summary judgment on the malicious-prosecution claim.  In her motion, Lopez argued that Blue could not establish the necessary elements of his claim because he could not show that the prosecution was carried on "maliciously and without probable cause."  Lopez offered two independent reasons for why this was so.  First, she contended that probable cause for the prosecution was "conclusively established" when the state trial court judge denied Blue's motion for directed verdict in the criminal trial. Lopez relied on a Georgia Supreme Court case in support of her argument— *Monroe v. Sigler*, 353 S.E.2d 23 (Ga. 1987).  Second, Lopez asserted that Blue's own statements established probable cause to prosecute him for aggravated assault, or closely related charges.  Lopez further contended she was entitled to qualified

---

[2]  After Lopez filed a motion to dismiss the Complaint, Blue filed an Amended Complaint.  The Amended Complaint is the operative pleading in this case.

immunity since she was a government defendant, and her conduct did not violate Blue's clearly established rights.

The district court ultimately granted summary judgment in favor of Lopez on the malicious-prosecution claim. But in doing so, it relied solely on *Monroe*, without considering whether Blue's own statements established probable cause. In particular, the district court held that in accordance with *Monroe*, Lopez definitively established probable cause for Blue's arrest through the Georgia trial court's denial of Blue's motion for directed verdict. So, the district court reasoned, Blue's malicious-prosecution claim failed as a matter of law. Consequently, the district court entered judgment for Lopez.

Blue now appeals.

## II.

We review *de novo* a district court's grant of a summary-judgment motion. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. In conducting our review, we consider the record and draw all reasonable inferences in the light most favorable to the non-moving party—here, Blue. *Strickland*, 692 F.3d at 1154; *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (per curiam) (citation omitted).

9

## III.

We have identified malicious prosecution as a violation of the Fourth Amendment and as a viable constitutional tort under § 1983.[3]  *See Kingsland v. City of Miami,* 382 F.3d 1220, 1234 (11th Cir. 2004); *Wood v. Kesler*, 323 F.3d 872, 880 (11th Cir. 2003).  To establish a federal claim for malicious prosecution under § 1983, a plaintiff must prove (1) the elements of the common-law tort of malicious prosecution and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures.  *Wood*, 323 F.3d at 881 (citations omitted).

In *Wood,* we noted as to the "constituent elements of the common law tort of malicious prosecution, this Court has looked to both federal and state law and determined how those elements have historically developed."  *Id.* (citations omitted).  To prove a § 1983 malicious-prosecution claim, under federal law and Georgia law, a plaintiff must establish the following: "(1) a criminal prosecution

---

[3] Lopez asserts that Blue waived the specific argument he makes on appeal by not raising it in the district court.  *See Ramirez v. Sec'y, U.S. Dep't of Transp.*, 686 F.3d 1239, 1249 (11th Cir. 2012) ("[W]e will generally refuse to consider arguments raised for the first time on appeal.").  In particular, Lopez takes issue with that aspect of Blue's argument on appeal contending that the district court erred by failing to apply a mandatory three-part test deriving from 42 U.S.C. § 1988 set forth in *Moore v. Liberty National Life Insurance Co.*, 267 F.3d 1209, 1214 (11th Cir. 2001), to determine whether the state law set forth in *Monroe* is at odds with federal law.  We find no waiver.  First, we do not reach the *Moore* issue in vacating the grant of summary judgment.  Second, we find that Blue did not waive the argument that the district court's application of the *Monroe* Rule was error—the basis on which we decide this appeal.  And third, even if any waiver occurred, we may exercise our discretion to consider Blue's argument because the issue raised is purely one of law, and the ends of justice will be best served by doing so.  *See Ramirez*, 686 F.3d at 1250.  That is so because "the proper resolution is beyond any doubt," and the argument at issue involves a "significant question[] of general impact or of great public concern[,]" *id.* (citations and internal quotation marks omitted), because the courts in our Circuit resolve numerous § 1983 claims for malicious prosecution.

10

instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Kjellsen v. Mills*, 517 F.3d 1232, 1237 (11th Cir. 2008) (quoting *Wood,* 323 F.3d at 881–82).

Here, the district court found, based on the Georgia criminal court's denial of the motion for directed verdict, that Blue could not establish a necessary element of his malicious-prosecution claim—a lack of probable cause. The district court did not conduct any independent analysis of whether probable cause in fact existed to prosecute Blue. Rather, it relied exclusively on the *Monroe* Rule and the denial of the motion for directed verdict in Blue's criminal prosecution to preclude Blue's claim. We therefore turn our attention to *Monroe*.

In *Monroe*, the Georgia Supreme Court considered whether a trial court's denial of a motion for directed verdict in an earlier criminal case served as a binding determination of the existence of probable cause in a later civil action for malicious prosecution. *Monroe*, 353 S.E.2d at 25. The court concluded it did. *Id.*

It gave two reasons why. First, the court reasoned that if a judge in the criminal case determined that sufficient evidence existed for a jury to find guilt of a crime beyond a reasonable doubt, then probable cause—a far lower standard than beyond a reasonable doubt—for the crime must have been established, if no "fraud or corruption" occurred. *Id.* And second, the court determined that policy justified

11

such a rule.  In this respect, the court explained, "It is 'the policy of the [Georgia] courts that malicious prosecution suits are not favored.  It is public policy to encourage citizens to bring to justice those who are apparently guilty.'" *Id.* (alteration omitted) (quoting *Day Realty Assocs. v. McMillan,* 277 S.E.2d 663, 664 (Ga. 1981)).

Blue argues that the district court erred in applying the *Monroe* Rule to grant summary judgment for Lopez.  We agree.

Federal law, not state law, governs the resolution of § 1983 claims.  And federal law does not allow the denial of a motion for directed verdict to serve as conclusive evidence of probable cause.

As we have previously noted, "a Fourth Amendment malicious prosecution claim under § 1983 remains a federal constitutional claim, and its elements and whether they are met ultimately are controlled by federal law." *Wood,* 323 F.3d at 882.  So although "courts historically have looked to the common law for guidance as to the constituent elements of the claim," *Uboh v. Reno*, 141 F.3d 1000, 1004 (11th Cir. 1998), "[w]hen malicious prosecution is brought as a federal constitutional tort, the outcome of the case does not hinge on state law, but federal law, and does not differ depending on the tort law of a particular state." *Wood*, 323 F.3d at 882 n.17.  Indeed, with respect to the very issue we consider here, we have cited with approval the Second Circuit's statement that the "federal law of

probable cause—not state law—should determine whether a plaintiff has raised a genuine issue of material fact with respect to a § 1983 malicious prosecution claim." *Id.* (quoting *Green v. Montgomery,* 219 F.3d 52, 60 n.2 (2d Cir. 2000)).

If the rule were otherwise, the same malicious-prosecution claim brought as a federal constitutional tort would result in different outcomes depending on the state in which it was prosecuted. But a § 1983 malicious-prosecution claim is a *federal* constitutional tort. It is therefore governed by federal law, so it will produce the same outcome, regardless of the state in which it is brought. Since our decision in *Wood*, we have reiterated this principle in other published cases. *See, e.g.*, *Kjellsen*, 517 F.3d at 1237; *Grider v. City of Auburn,* 618 F.3d 1240, 1256 (11th Cir. 2010).

Here, however, the district court relied on state law instead of federal law to resolve Blue's malicious-prosecution claim. And in this case, the state law the district court relied upon—the *Monroe* Rule—yields a resolution that federal law does not allow. This is so for four reasons.

*First*, the standard for denying a motion for directed verdict under Georgia law does not in any way measure the quality of the evidence that allegedly supports conviction. Under Georgia law, a court must deny a motion for directed verdict in a criminal trial unless, in viewing the evidence in the light most favorable to the government, no rational trier of fact could find the defendant

13

guilty beyond a reasonable doubt.  *See Mack v. State*, 529 S.E.2d 132, 134 (Ga. 2000).  But significantly, in evaluating a motion for directed verdict, the court may not make credibility determinations and may not weigh evidence.  *See Willis v. State*, 436 S.E.2d 204, 205-06 (Ga. 1993).  So the criminal court's denial of a motion for directed verdict indicates nothing about the credibility, reliability, or quality of the government's evidence that the defendant committed a crime.  And it is possible that a jury in a later civil § 1983 malicious-prosecution case may conclude that the very same evidence on which the court relied to deny a defendant's motion for directed verdict in the criminal case is unreliable or not worthy of credence and therefore that no reasonable officer truly could have believed that it supported a finding of probable cause.

Nor does *Monroe*'s fraud-and-corruption exception account for this problem.  The *Monroe* Rule does not apply in the case of fraud or corruption.  Under Georgia law, the fraud-and-corruption exception pertains to the "perpetration of a fraud upon the court" or the "intentional corruption of the criminal trial," meaning, for example, that someone involved in the prosecution bribed the judge to deny the motion for directed verdict of acquittal.  *Akins v. Warren*, 375 S.E.2d 605, 606 (Ga. 1989).  But a jury evaluating a § 1983 malicious-prosecution claim may choose to disbelieve a civil defendant based on far less than evidence that the defendant engaged in a fraud on the court or that she intentionally corrupted the criminal trial.

14

So the fraud-and-corruption exception to the *Monroe* Rule cannot render the Rule a viable stand-in for a factual determination of whether probable cause actually existed at the time of the prosecution.

*Second*, a criminal court deciding a motion for directed verdict assesses the evidence supporting conviction as it exists at a different point in time than the point in time at which evidence supporting probable cause in a malicious-prosecution claim is assessed. On a motion for directed verdict, the criminal court must evaluate all of the evidence entered during the trial to determine whether a reasonable jury could find the defendant guilty of the crime charged. But in a malicious-prosecution case, the civil court measures whether the defendant had probable cause to believe a crime occurred as of the beginning of the criminal proceeding. *See Kingsland*, 382 F.3d at 1235. Whether we mark the beginning of the criminal proceeding as of the time of arraignment, *see id.*, or at the start of the trial, the evidence existing at that time often differs in at least some respects from the evidence adduced during trial. So if we allowed the denial of a motion for directed verdict in the criminal trial to determine in the civil case whether probable cause existed, we would be relying on a ruling that depended on different evidence than that relevant to the inquiry in the civil case.

*Third*, the functions of § 1983 and the Georgia malicious-prosecution action differ. As we have noted, the *Monroe* Court acknowledged that Georgia law

15

disfavors malicious-prosecution claims.  *See Monroe*, 353 S.E.2d at 25.  Section 1983, on the other hand, is not a disfavored cause of action.  Rather, it was designed to provide a broad remedy for violations of federally protected civil rights such as those secured by the Fourth Amendment—including the right against unlawful seizure as embodied in a malicious-prosecution claim.  *See e.g., Kalina v. Fletcher*, 522 U.S. 118, 123 (1997) (§ 1983 "is a codification of § 1 of the Civil Rights Act of 1871"; the coverage of § 1983 is broad); *Owen v. City of Independence,* 445 U.S. 622, 636 (1980) (§ 1983 provides a broad remedy for violations of federally protected rights).  But where a directed verdict was previously denied, the *Monroe* Rule begrudgingly allows for malicious-prosecution claims to be brought under Georgia law only when an alleged victim of the violation can prove fraud on the criminal court or corruption of the criminal trial.  Georgia law's presumption disfavoring all malicious-prosecution claims—no matter how meritorious—runs contrary to the remedial purpose of § 1983 and the Fourth Amendment.

And *fourth*, allowing application of the *Monroe* Rule to negate federal claims where a defendant exercised his right to move for a directed verdict in a criminal proceeding would lead to perverse results.  A criminal defendant aware of this rule might forego his right to move for a directed verdict in favor of preserving a later Fourth Amendment claim for malicious prosecution.  Indeed, had Blue not

moved for a directed verdict in his criminal case, the district court could not have granted Lopez's motion for summary judgment on the grounds it did.

For all of these reasons, a district court evaluating a motion for summary judgment must apply only the federal summary-judgment standard in determining whether summary judgment should be granted.[4]  A court may grant summary judgment only when, after viewing all evidence in the light most favorable to the non-moving party—in a § 1983 case, often the plaintiff—the court determines that no genuine dispute of material fact exists, and the movant is entitled to judgment as a matter of law.  *Strickland*, 692 F.3d at 1154.  Here, the district court never applied this standard to the evidence of record.  Consequently, we remand this matter to the district court to apply the correct standard in the first instance.

## IV.

We conclude that the district court erred in granting summary judgment for Lopez based solely on the *Monroe* Rule.  We therefore remand the case for further proceedings, so the district court can address Lopez's alternative arguments that

---

[4] Despite Lopez's arguments to the contrary, *Jannuzzo v. Glock, Inc.*, 721 F. App'x 880 (11th Cir. 2018), does not require a different outcome.  There, we upheld the district court's order dismissing the plaintiff's complaint alleging, among other things, a § 1983 claim for malicious prosecution.  Noting that the criminal court had denied three motions for directed verdict, we concluded that the plaintiff's complaint failed to plausibly establish fraud or corruption.  *Id.* at 883.  *Jannuzzo* is an unpublished decision and is not binding.  11th Cir. R. 36-2.  Nor did the plaintiff in *Jannuzzo* raise the issue of whether the *Monroe* Rule was inconsistent with federal law, rendering it inapplicable to a § 1983 malicious-prosecution claim.  As a result, the panel in *Jannuzzo* was not faced with the question presented here, and the case is not instructive.

17

she established probable cause from the facts of the case and that she was entitled to qualified immunity. We do not opine on the viability of Lopez's arguments but merely conclude that the denial of Blue's motion for directed verdict in the criminal case does not conclusively establish probable cause in this civil case.

**VACATED AND REMANDED.**