[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14048

_____

D.C. Docket No. 6:15-cv-00677-CEM-GJK

RANDALL GREER,

Plaintiff-Appellant,

versus

WAYNE IVEY,
TOWN OF INDIALANTIC,
JAMES HAMAN,
DIOMEDIS CANELA,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 25, 2019)

Before JORDAN, GRANT, and HULL, Circuit Judges.

PER CURIAM:

On January 13, 2013, Christopher Greer was shot and killed in his home by sheriff's deputies James Haman and Diomedis Canela. Christopher's brother, Randall Greer, sued the Town of Indialantic, Sheriff Wayne Ivey, and the two deputies, alleging violation of Christopher's Fourth Amendment rights under 42 U.S.C. § 1983 and violations of Florida state law. The district court granted summary judgment on all claims in favor of the defendants, and Randall appealed. After thorough review, and with the benefit of oral argument, we conclude that a genuine dispute of material fact should have precluded the grant of summary judgment on Randall's claims relating to the deputies' use of force. We therefore affirm in part, reverse in part, and remand the case to the district court.

I.

Indialantic is a small town, and the Greer residence was well-known to local law enforcement. Christopher, who was forty-nine years old, had shared the home with his ailing parents for years. The Indialantic police frequently fielded 911 calls from Christopher and his mother reporting hallucinated home invasions. Christopher's parents had died within the last few months, however, and he had been living alone ever since.

Randall Greer, Christopher's brother and a city councilman, worried that Christopher was becoming increasingly paranoid and unstable. A month before the shooting, Randall sought to have Christopher involuntarily committed under

2

Florida's Baker Act, but Police Chief Troy Morris said that he could not "Baker Act" Christopher unless he posed a threat. Chief Morris said that if Christopher ever behaved violently, Randall should call the police.

On the day of the shooting, Randall spent all day cleaning Christopher's garage while Christopher sat inside, smoking cigarettes and watching TV. As he was getting ready to leave with his wife, Randall criticized Christopher for being unhelpful. Christopher reacted poorly to the accusations, and Randall threatened to call the police. In response, Christopher pulled out a knife and hobbled toward Randall, waving the knife in the air. Randall easily disarmed his brother, who suffered from chronic foot and back problems and had no use of his left arm. Still, after Randall confiscated the knife, Christopher exclaimed, "I don't need that" and grabbed Randall's wife by the throat. She calmed him down, and he retreated into the house after apologizing. At that point, as Chief Morris had advised him to do, Randall reported the incident to the police.

Officer Scott Holstine of the Indialantic police force was first on the scene. He told Randall and his wife that his primary concern was to Baker Act Christopher, and that he would "worry about criminal charges later." Holstine then approached Christopher, who was standing in the front doorway: "Hey Chris, I need you to come out here and talk to me." Christopher replied sharply, yelling, "Don't even think about it, don't try it!" and slammed the door. After that

3

outburst, Holstine instructed Randall and his wife to leave the scene and called the Brevard County Sheriff's Department for backup.

Two Brevard Sheriff's deputies, Haman and Canela, responded to the call for backup. Haman arrived first, and Holstine briefed him on the situation, including a warning that Christopher might have weapons—knives, a disassembled cross-bow, and firearms. Haman took charge from that point on. He used the PA system in Holstine's vehicle to ask Christopher to come out of the house, but Christopher refused. At Haman's instruction, Canela arrived on the scene shortly thereafter with a ballistic shield. After another failed attempt to coax Christopher out through the front door, Haman and Canela noticed that the garage was open and decided to approach the house that way.

Both deputies had their guns drawn as they neared the house. Holstine, also armed, stayed about ten feet back to provide cover. Once they reached the house, the deputies opened the interior door, but Christopher appeared and slammed it shut. At that time, the deputies observed that Christopher had a sheathed knife on his belt. Haman began to kick the door, which was somehow obstructed, but it eventually swung open. Canela testified that he moved closer to the door, where he saw Christopher standing back a few feet. Canela yelled "knife!" almost immediately, and he and Haman opened fire—again, almost immediately (and only eleven minutes after Haman arrived on the scene). Haman and Canela said that

4

Christopher was moving toward them with a knife raised above his head, as though he intended to stab them. Holstine's testimony, on the other hand, indicated that he did not see Christopher wielding a knife in that way. Regardless, the deputies fired thirteen rounds as the door swung closed. According to a ballistics expert, eleven of those thirteen rounds passed through the door. When they entered the house, the deputies found Christopher lying on the floor; he had been struck by eight of the thirteen rounds and died of his wounds at the scene. The deputies found a sheathed Ka-Bar knife attached to Christopher's belt on his right side, as well as a large fixed-blade knife—bent, broken and covered in blood—in the folds of a coat near Christopher's left leg. They also noticed a marking on the door that appeared to be a knife gouge.

Following Christopher's death, Randall sued a host of defendants, both in his individual capacity and as a representative of Christopher's estate. At summary judgment, the counts that remained were the § 1983 excessive force claims against Haman and Canela (Counts III and IV), the wrongful death claims against Haman and Canela (Counts IX, X, XXII and XXIII), a negligent infliction of emotional distress claim against Haman and Canela (Count XIV), an intentional infliction of emotional distress claim against Haman and Canela (Count XX), a vicarious liability claim against the Brevard County Sheriff Wayne Ivey (Count VII), and a vicarious liability claim against the Town of Indialantic (Count VIII). The district

court, without explicitly saying so, accepted the deputies' account of the facts as credible and concluded that they acted reasonably and in good faith under the circumstances. That conclusion was dispositive of most of Randall's claims. The district court granted summary judgment in favor of the defendants on all counts.

## II.

We review an order granting summary judgment *de novo*, viewing the record in the light most favorable to the non-moving party. *Blue v. Lopez*, 901 F.3d 1352, 1357 (11th Cir. 2018). Summary judgment is appropriate only when "no genuine dispute of material fact exists, and the movant is entitled to judgment as a matter of law." *Id.* at 1360. If the existence of a material fact turns on credibility determinations, then summary judgment is improper, and the case should proceed to trial. *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006).

The principal question in this case is whether, viewing the facts in the light most favorable to Randall Greer, it was reasonable for Haman and Canela to use deadly force on Christopher. Once we have "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of [the deputies'] actions . . . is a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (citation omitted); *Wate v. Kubler*, 839 F.3d 1012, 1019 (11th Cir. 2016).

6

The answer to that question—under both federal law and Florida law—turns on whether, in the moment before the shooting, the deputies reasonably believed that Christopher posed an immediate threat to their safety. *See Perez v. Suszczynski*, 809 F.3d 1213, 1222 (11th Cir. 2016) (holding that "deadly force is not justified '[w]here the suspect poses no immediate threat to the officer and no threat to others'" (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985))); *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015) ("As to deadly force, a police officer may use such force to dispel a threat of serious physical harm to either the officer or others, or to prevent the escape of a suspect who threatens this harm."); *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. Dist. Ct. App. 1996). The parties disagree over what transpired in that pivotal moment.

As we have previously cautioned, "the mere presence of a . . . weapon is not enough to warrant the exercise of deadly force and shield an officer from suit. Where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination." *Perez*, 809 F.3d at 1220. Here, the reasonableness determination turns on two questions: Was Christopher holding a knife when he was killed? And, if so, what was he doing with it?

The evidence is mixed. First, the perspective of the deputies. Haman and Canela argue vigorously that they shot Christopher in self-defense. According to

7

their testimony, they were just two or three feet away from a "knife wielding man who had recently threatened two family members and was advancing on their position." The deputies claim that they saw Christopher wielding a "huge" knife—perhaps a "kitchen knife"—when they kicked open the door. They maintain that Christopher approached them "aggressively" with the knife raised "above his head," making "a downward stabbing motion." In Canela's words, "he was actually coming towards the door, towards us," as if "he was gonna stab." Canela described Christopher as "charging towards" them, and Haman said, "he came right at me." The officers said they feared for their lives. Judging purely from their own accounts, the deputies' actions were reasonable.

The case is not quite that clear, however. Officer Holstine was standing about ten feet behind Haman and Canela when the two deputies opened fire, and his statements to police investigators differed from the deputies' account in one critical respect. Holstine testified that he "could only see Chris from chest up" over Haman's shoulder. From that vantage point, Holstine presumably would have seen a knife raised above Christopher's head. But when asked, "Did you see Chris's hands at all?" Holstine replied, "I couldn't, 'cause my view was blocked by Jim Haman." When specifically asked if he saw a knife, Holstine said, "I did not." According to Randall, Holstine's testimony suggests that Christopher's

8

hands must have been below his chest—perhaps down by his sides—when the deputies started shooting.

The physical evidence in the record does not decisively vindicate either side's account. First, the fact that Christopher's body was not found with a knife in or near his hand makes it harder to conclude that he was necessarily holding a knife when he was killed. Of the two knives recovered from the scene, one was found still in its sheath. That leaves the second, the bloody and broken fixed-blade knife, as the one that the deputies could have seen in Christopher's hand. Recall that after the shooting the deputies described the knife they saw in Christopher's hand as a kitchen knife. But one deputy later conceded under oath that the broken knife did not look like a kitchen knife, and neither of them could positively identify the broken knife as the weapon they saw. What's more, the broken knife was found in the folds of a coat lying by Christopher's *left* side—perhaps surprising, given that Christopher only had use of his right hand. That said, a police special agent investigating the incident noted that the coat could have been pushed to that spot when the deputies opened the door after the shooting. And the aftermath of the shooting was hectic, with a bomb squad and fire department medics on the scene; one deputy said that he couldn't be sure that evidence was not moved in the commotion.

9

Physical evidence also at least calls into question the contention that Christopher was charging toward the deputies when they opened fire. Photographs show that the door opened into the house rather than out into the garage. Moreover, bullet holes indicate that the door was closing when the deputies shot Christopher, and a defense expert also testified to that conclusion. Indeed, although Canela said that Christopher was "in front of the door with the knife" when the deputies opened fire, Christopher's body was found behind the closed door after the shooting—not in front of it—with most of the bullets having gone through the door. On the other hand, the defense expert also noted that "the inside garage door displays an apparent stab mark" consistent with movement "from inside the door . . . toward the garage." And in his deposition, Randall admitted that he had not noticed any such stab mark on the door earlier in the day—which leaves open the possibility that Christopher was stabbing toward the door during the confrontation with the deputies.

Having reviewed the record, we cannot say that the deputies' conclusion is indisputable—and we certainly cannot say so under the view of the facts most favorable to Randall. The physical evidence and the witnesses' testimony could support the officers' claims that Christopher was poised to attack them. It could also support Randall's claims that the officers did not reasonably fear for their safety. But it is not our place to resolve that dispute of fact; it is the jury's.

10

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The district court thus erred by making a legal judgment before a jury had a chance to piece together what really happened.

Our decision in *Garczynski v. Bradshaw*, 573 F.3d 1158 (11th Cir. 2009), does not demand a different result.  As an initial matter, we emphasized that an excessive force inquiry will turn on the "particular facts of each case."  *Id.* at 1166.  It is true that we upheld summary judgment in that qualified-immunity case, despite the fact that there, as here, one officer did not see the weapon and the weapon was found in a non-obvious spot.  That, however, is really where the similarities end.   In *Garczynski*, police officers surrounded the car of an armed suicidal man and ultimately shot him dead.  While the parties disagreed about whether Garczynski aimed his gun at the officers, there was no dispute that he had refused to comply with their repeated demands to drop the weapon.  *Id.* at 1169.  And the only officer to testify that he could not see the firearm viewed the scene from forty feet away and through a fogged car window.  *Id.* at 1168.  Here, by contrast, Holstine stood only ten feet away from Christopher.  More broadly, we took care to note in *Garczynski* that less is required for an officer to reasonably perceive an immediate threat when the suspect is armed "with a gun, rather than a

11

knife."  *Id.* at 1169 n.3; *see also Perez*, 809 F.3d at 1220 (observing that "a person standing six feet away from an officer with a knife may present a different threat than a person six feet away with a gun").

Between the physical evidence and Holstine's conflicting testimony, then, significant issues of material fact exist regarding whether Christopher was in fact raising a knife and charging at the deputies when they shot him.  And as we have previously said, the task of weighing the credibility of police testimony against other evidence "is the stuff of which jury trials are made."  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013).  Accordingly, those counts that turn on the reasonableness of the deputies' use of deadly force must proceed to trial.  These counts include the § 1983 claims, because the law was clearly established at the time of Randall's death that shooting a person who has done nothing threatening and thus never posed an immediate danger violates the Fourth Amendment right to be free from the use of excessive force.  *See Mercado v. City of Orlando*, 407 F.3d 1152, 1157-58 (11th Cir. 2005); *Lundgren v. McDaniel*, 814 F.2d 600, 603 (11th Cir. 1987).  These counts also include state tort law claims dismissed on statutory immunity grounds, because there is a genuine issue of fact as to whether the deputies exhibited "wanton and willful disregard of human rights, safety, or property."  *See* Fla. Stat. § 768.28(9)(a) (providing that officers who exhibit "wanton and willful disregard of human rights, safety, or property" are not

12

immune from tort liability); *Thompson v. Douds*, 852 So. 2d 299, 309 (Fla. Dist. Ct. App. 2003) (holding that evidence of officers' excessive force could indicate wanton and willful disregard, precluding summary judgment on statutory immunity grounds). We therefore reverse and remand on the § 1983 excessive force claims against Haman and Canela (Counts III and IV), and the wrongful death claims against Haman and Canela (Counts IX, X, XXII, and XXIII).[1]

## III.

As for the remaining issues on appeal, we find no error.

Count VIII seeks to hold the Town of Indialantic vicariously liable for Police Chief Morris's and Officer Holstine's alleged negligent communication with other officers. We agree with the district court that the officers were engaged in Category II law enforcement activity under Florida's *Trianon* taxonomy, and therefore did not owe Christopher a special duty of care. *See Wallace v. Dean*, 3 So. 3d 1035, 1047 (Fla. 2009). Nor did any "special relationship" between the Indialantic police and Christopher give rise to a duty of care. *Id.* at 1048. Finally, neither officer's statements constituted the "express promise" of assistance

---

[1] While Randall failed to mention Deputy Haman by name in his briefing of the Florida state law claims, he clearly states that the factual issues discussed above should preclude summary judgment on Counts IX, XIV, XXII, and XXIII. We therefore cannot conclude that Randall has "abandoned all state law claims against Sergeant Haman on appeal." Furthermore, because we remand Counts X, XXII and XXIII for trial, we need not reach Randall's argument that the district court abused its discretion by allowing Canela to file an untimely motion for summary judgment on those counts.

required to establish a heightened duty of care under Florida law. *See Hartley v. Floyd*, 512 So. 2d 1022, 1024 (Fla. Dist. Ct. App. 1987). The grant of summary judgment on Count VIII is affirmed.

Count VII, which seeks to hold Sheriff Ivey vicariously liable for Haman and Canela's alleged negligence, is also meritless. The deputies' use of force was intentional, not negligent. *See Sanders*, 672 So. 2d at 48 ("[I]t is not possible to have a cause of action for 'negligent' use of excessive force because there is no such thing as the 'negligent' commission of an 'intentional' tort."). Nor does the evidence support Randall's claim that the deputies were negligent in how they approached the house prior to the shooting. The grant of summary judgment on Count VII is affirmed.

With respect to Count XX, which seeks to hold Haman and Canela liable for intentional infliction of emotional distress, we conclude that the district court properly stated the law and found that Randall had failed to produce any evidence beyond bare allegations of his "severe" emotional distress. As for Count XIV, Randall has likewise failed to prove that he has suffered a "physical injury" caused by the "psychological trauma" of his brother's death, and thus has not carried his burden in proving the elements of negligent infliction of emotional distress.[2] *Zell*

---

[2] We may affirm for any reason supported by the record, even one not relied on by the district court. *See United States v. Chitwood*, 676 F.3d 971, 975 (11th Cir. 2012).

*v. Meek*, 665 So. 2d 1048, 1054 (Fla. 1995). Accordingly, the grant of summary judgment on Counts XIV and XX is affirmed.

Randall also argues that while the Third Amended Complaint never stated a § 1983 claim for warrantless entry, such a claim was tried by "implied consent" under Federal Rule of Civil Procedure 15(b)(2). This argument is a non-starter for the simple reason that this case has not yet been tried. Rule 15(b) is titled "Amendments During and After Trial." *Id.* We have held that the Rule is thus "inapposite where, as here, there was no trial because the district court decided the case at the summary judgment stage." *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990). Warrantless entry could not have been tried by implied consent, so the district court did not err in refusing to consider this claim.

Finally, Randall argues that the district court abused its discretion by striking his expert witness's untimely rebuttal report. But a party who fails to timely disclose an expert report may not use that report at trial "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c). Dr. Marraccini's July 1, 2016 report was filed one month late, on the final day of discovery, and, critically, after Dr. Marraccini had already been deposed. It is "harmful to deprive opposing counsel of the expert's report before his deposition" because opposing counsel needs an opportunity to prepare an appropriate line of questioning. *Walter*

15

*Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1413 (11th Cir. 2011).  We therefore

affirm the district court's order striking Dr. Marraccini's July Report and

prohibiting him from opining on matters outside the scope of his April Report.

IV.

To summarize, we reverse the district court's grant of summary judgment on

Counts III, IV, IX, X, XXII, and XXIII; we affirm on Counts VII, VIII, XIV, and

XX, as well as on the challenged procedural rulings; and we remand for further

proceedings.  We underscore that our opinion today passes no judgment on the

deputies' credibility or the impact of the physical evidence, each of which must be

determined in the first instance by a trier of fact.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**