[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-16804
_____

D.C. Docket No. 2:15-cv-01487-KOB


BOB GLASSCOX,

Plaintiff - Appellee,

versus

ARGO, CITY OF,
DAVID RAMSAY MOSES,
In His Individual Capacity,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(September 12, 2018)

Before ROSENBAUM, JILL PRYOR and RIPPLE,[*] Circuit Judges.

_____

[*] The Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

JILL PRYOR, Circuit Judge:

Bob Glasscox was driving his pickup truck down the interstate in Alabama when he experienced an episode of diabetic shock. Physically unable to control his truck, Mr. Glasscox began driving erratically at high speeds. Concerned motorists reported Mr. Glasscox's driving to law enforcement, and David Moses from Argo City Police responded and gave chase. After Mr. Glasscox's truck came to a stop in the median, Officer Moses approached the truck and, while yelling at Mr. Glasscox to get out, tased him four times in rapid succession. The incident was captured on Officer Moses's body camera, which recorded Mr. Glasscox's attempts—between taser shocks—to comply with the officer's orders.

This appeal arises out of a civil lawsuit Mr. Glasscox filed against Officer Moses and the City of Argo, alleging claims under 42 U.S.C. § 1983 for excessive use of force. The district court converted Officer Moses's and the City's motions to dismiss into motions for summary judgment and, viewing the facts in the light most favorable to Mr. Glasscox, denied the motions based on its ruling that his clearly established constitutional rights were violated. We agree with the district court that at this stage of the case Officer Moses is not entitled to qualified immunity. And because Mr. Glasscox has, for purposes of summary judgment,

2

established a constitutional violation, the district court also properly denied the

City's motion.  We affirm.

## I.    FACTUAL BACKGROUND[1]

Mr. Glasscox, who lives with Type 1 diabetes, suffered a severe

hypoglycemic episode while driving his pickup truck on Interstate 59 South near

the City of Argo, Alabama.  His condition caused him to begin driving erratically.

After other drivers on the interstate reported his erratic driving, the Argo City

Police dispatched Officer Moses to the scene.  What followed was captured on

Officer Moses's body camera.[2]

Officer Moses began following Mr. Glasscox, who was "doing about 80" in

a 70 mile-per-hour zone.  Doc. 31-1 at 10.[3]  Officer Moses activated his emergency

lights and siren, yet Mr. Glasscox's truck began to accelerate, weaving from the

fast lane onto the median of the divided highway and narrowly missing some

roadside signs and a guardrail.[4]  Officer Moses followed Mr. Glasscox for

---

[1] At this stage, we must view the evidence in the light most favorable to Mr. Glasscox, but we emphasize "that the facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000) (internal quotation marks omitted).

[2] The body camera recording, Exhibit A, was entered onto the docket at Doc. 19-1.

[3] "Doc. #" refers to the numbered entry on the district court's docket.

[4] As recorded by the body camera, approximately 10 minutes after Mr. Glasscox's truck came to a stop, Officer Moses relayed to backup officers that Mr. Glasscox's maximum speed was "over 80" miles per hour.  More than six months later, Officer Moses testified in Mr. Glasscox's criminal proceedings that Mr. Glasscox was at one time driving over 115 miles per hour.  In any event, because we must view the facts in the light most favorable to Mr. Glasscox,

3

approximately five miles.  Eventually, the truck came to a stop, halting in the interstate's median near the northbound fast lane.

Officer Moses got out of his car and ran to the driver's side of Mr. Glasscox's truck.  At that point, he was standing very close to the fast lane of the northbound interstate where cars were speeding by.[5]  He had two weapons drawn: his firearm and his taser.  Pointing his weapons into the glass of the driver's side window, Officer Moses exclaimed, "Let's see your fucking hands!"  Doc. 19-1, Ex. A at 2:50-2:51.  Mr. Glasscox raised his hands, which were empty.  Officer Moses opened the driver's side door and shouted, "Get out of the car!"  *Id.* at 2:54-2:55.  Mr. Glasscox, whose seatbelt was still buckled and hands were still raised, said, "I'm sorry, man."  *Id.* at 2:56-2:57.  He then said something that is difficult to decipher, but the parties agree it was either "God damn, man," or "God darn, man."  Officer Moses again shouted, "Get out of the car!"  *Id.* at 3:00-3:01.  At this point in the video recording, only one of Mr. Glasscox's hands is visible; he appears to be reaching toward his seatbelt.  Officer Moses yelled, "Put your seatbelt off now," and Mr. Glasscox quickly unbuckled his seatbelt.  *Id.* at 3:01-3:05.  Officer Moses quickly commanded, "Get out," and Mr. Glasscox began to say, "I'm going to get

---

we accept for purposes of this appeal that Mr. Glasscox's maximum speed was closer to 80 than 115 miles per hour.  Our analysis would be the same, however, even if we were to accept Officer Moses's later statement that Mr. Glasscox's truck was traveling over 115 miles per hour.

[5] Officer Moses's video does not show precisely how close he was to the northbound fast lane, but it is apparent that he was no more than a few feet from it.

out if you'd shut up." *Id.* at 3:06-3:10.  Officer Moses, talking over Mr. Glasscox,

warned, "Don't you reach,"[6] and immediately deployed his taser.  *Id.* at 3:07.  The

taser shock came before Mr. Glasscox could finish his sentence, approximately

four seconds after he unbuckled his seatbelt and two seconds after Officer Moses

issued his latest order to get out of the truck.  The taser wires latched into Mr.

Glasscox's chest and remained engaged for five seconds while Mr. Glasscox

screamed, shook, and writhed in pain with his arms and hands curling toward his

chest.  Officer Moses holstered his firearm as the taser was being deployed.

Officer Moses admitted that after this first use of the taser, he could see both

of Mr. Glasscox's hands, which the video shows were empty.  Less than a second

after the end of the first shock, while Mr. Glasscox's hands remained curled toward

his chest and he continued to howl and writhe in pain, Officer Moses yelled, "Get

out, now!" *Id.* at 3:15-3:16.  Still howling, Mr. Glasscox attempted to pull one of

the taser wires from his chest.  Immediately—three to four seconds after the first

taser shock—Officer Moses deployed his taser a second time, again for five

seconds.  During these five seconds, while Mr. Glasscox was shaking, screaming,

and writhing in pain, Officer Moses yelled, "Stop it!  Get out of the car!" *Id.* at

---

[6] Although the video is blurry at this point due to rapid movement, Mr. Glasscox's hands appear to have moved briefly to his right side a moment before Officer Moses warned him not to reach.

3:19-3:20.  Again, Mr. Glasscox's arms and hands can be seen curling toward his chest from shock of the taser.

Less than a second after the second shock ended, Officer Moses yelled, "I'll give it to you again!  Get out of the car!"  *Id.* at 3:23-3:25.  Mr. Glasscox pleaded, "I'll get out if you just leave me alone!"  *Id.* at 3:25-3:27.  Within one second, Officer Moses moved closer and grabbed Mr. Glasscox's wrist with his free hand, demanded that Mr. Glasscox "get out," and tased Mr. Glasscox a third time, again for five seconds.  *Id.* at 3:29-3:30.  In total, about six seconds passed between the second and third deployments.  As Officer Moses tased Mr. Glasscox for the third time, Mr. Glasscox yelled, "I will!"  *Id.* at 3:29-3:30.

While the taser was still active, with Mr. Glasscox still shaking uncontrollably and writhing from the shock, Officer Moses held onto Mr. Glasscox's wrist and again yelled, "Get out of the car!"  *Id.* at 3:32-3:33.  As soon as the shock ended and he could speak, Mr. Glasscox cried again, "I will!"  *Id.* at 3:35.  Less than two seconds later, before Mr. Glasscox had a chance to get out of the truck, Officer Moses deployed his taser a fourth time, first aiming the taser near Mr. Glasscox's chest and then bringing the weapon to the side of Mr. Glasscox's thigh for direct contact.  As he brought the taser to Mr. Glasscox's thigh, Officer Moses yelled, "Stop it!"  *Id.* at 3:38.  When Officer Moses touched the active taser to Mr. Glasscox's thigh, Mr. Glasscox brought his hand to the taser.  Officer

6

Moses, still holding the taser to Mr. Glasscox's thigh, shouted, "Get out of the car!" *Id.* at 3:41-3:42. Mr. Glasscox let go of the taser and again cried, "I will!" *Id.* at 3:42. Officer Moses released the taser, and as he did, he said, "Stop fighting! Get out!" *Id.* at 3:43, 3:46. Mr. Glasscox yelled, "Okay!" *id.* at 3:47, and with Officer Moses still holding his wrist, swung his legs out of the truck and stood up on the side of the road. While holding the taser, with at least one of its wires still attached to Mr. Glasscox's shirt, Officer Moses handcuffed Mr. Glasscox and walked him to the back of the truck on the driver's side, still mere feet from the northbound fast lane. All the while, cars were speeding by.

After about a minute behind the truck, Officer Moses walked Mr. Glasscox to the patrol car, located on the other side of the median near the southbound fast lane. By this point, police backup had arrived. Officer Moses told the backup officer that Mr. Glasscox was "bleeding all over the place" and had taken "five rides."[7] *Id.* at 6:11-6:17. Officer Moses unhooked the taser wires from Mr. Glasscox's shirt and asked him, "What is wrong with you, sir?" *Id.* at 7:59-8:00. Mr. Glasscox responded that he is a diabetic and his blood sugar was low. According to the emergency medical services report and Mr. Glasscox's treating physician, his blood sugar level was indeed low, and his erratic driving resulted from a severe hypoglycemic episode. Mr. Glasscox suffered physical injuries,

---

[7] A "ride" refers to the deployment of the taser. In fact Officer Moses deployed his taser four, not five times.

including bleeding from the taser probes, and psychological injuries, including possible Post-Traumatic Stress Disorder, from his encounter with Officer Moses.

At the scene, Officer Moses told Mr. Glasscox that if in fact he was suffering from diabetic shock, law enforcement would not press charges. Nonetheless, Mr. Glasscox was charged with reckless driving, eluding a police officer, and resisting arrest. A municipal court found him guilty in 2015, and he appealed to the county's circuit court for a *de novo* determination of guilt before a jury. As far as we can tell, Mr. Glasscox is still awaiting a jury trial on the criminal charges.

Mr. Glasscox sued Officer Moses and the City under 42 U.S.C. § 1983 for excessive use of force in violation of the Fourth Amendment. The defendants moved to dismiss; the district court, with notice, converted their motions to motions for summary judgment. In his motion, Officer Moses asserted that he was entitled to qualified immunity. In its motion, the City argued that it was not liable for Mr. Glasscox's injuries because Officer Moses did not violate Mr. Glasscox's constitutional rights. After Mr. Glasscox responded with evidentiary submissions, the district court denied the motions. As relevant to this appeal, the district court, viewing the evidence in the light most favorable to Mr. Glasscox, concluded that Officer Moses violated his clearly established right to be free from the excessive use of force. Officer Moses now appeals the denial of qualified immunity. The

8

City also appeals and can prevail only if we determine as a matter of law that there was no constitutional violation.

## II.    STANDARD OF REVIEW

Our review of a district court's entry of summary judgment is *de* novo, and we view the facts in the light most favorable to the nonmoving party. *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006). We must draw all reasonable inferences in favor of the party opposing summary judgment. *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1313 (11th Cir. 1999). "Even where the parties agree on the facts, if reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Manners v. Cannella*, 891 F.3d 959, 967 (11th Cir. 2018) (internal quotation marks omitted).

In contrast, summary judgment should be granted when the record evidence shows that there is no genuine dispute concerning any material fact and the movant is entitled to judgment as a matter of law. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (citing Fed. R. Civ. P. 56(a)). Conclusory allegations and speculation are insufficient to create a genuine issue of material fact. *See Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.").

9

In every case, "'[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record [as with a video recording of the incident], so that no reasonable jury could believe it, a court should not adopt that version of the facts.'"  *Manners*, 891 F.3d at 967 (alteration adopted) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## III.  DISCUSSION

A government official asserting a qualified immunity defense bears the initial burden of showing "he was acting within his discretionary authority."  *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007).  After the official makes this showing—and here it is undisputed—the burden shifts to the plaintiff to show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation."  *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).

Viewing the evidence in the light most favorable to Mr. Glasscox and drawing all reasonable inferences in his favor, we conclude that Officer Moses violated his constitutional right to be free from the excessive use of force by repeatedly tasing him even though Mr. Glasscox had ceased any resistance and was attempting to comply with Officer Moses's commands.  We thus affirm the district

10

court's denial of the City's motion for summary judgment.[8]  We also conclude that the law was clearly established at the time of Mr. Glasscox's encounter with Officer Moses that the repeated deployment of a taser on an arrestee who has stopped resisting and is attempting to comply constituted excessive force.  We affirm the denial of qualified immunity to Officer Moses.

## A.     Officer Moses's Repeated Deployment of His Taser Despite Mr. Glasscox's Lack of Resistance and Attempts at Compliance Violated the Fourth Amendment.

On appeal, Officer Moses argues that his repeated use of the taser on Mr. Glasscox was a reasonable display of force in light of the dangerous circumstances he encountered and Mr. Glasscox's resistance to arrest.  We disagree.  Even assuming that Officer Moses reasonably deployed his taser twice, a reasonable jury could find that the continued tasing—when the video recording conclusively shows that Mr. Glasscox was not resisting but instead voicing his desire to comply with the officer's commands, provided he was given a chance to do so—violated Mr. Glasscox's Fourth Amendment right to be free from the excessive use of force.[9]

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in

---

[8] Because only individual officials can be entitled to qualified immunity, the only issue the City raises in this appeal is whether, viewing the evidence in the light most favorable to Mr. Glasscox, Officer Moses violated Mr. Glasscox's constitutional rights.

[9] We assume for purposes of this opinion but do not decide that the first two taser shocks were justified.

11

the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). To determine whether an officer's use of force was excessive, we ask "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Id.* (internal quotation marks omitted). The Supreme Court instructed in *Graham v. Connor* that "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." 490 U.S. 386, 396 (1989) (internal quotation marks omitted). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.*[10]

To balance the necessity of using some force in making an arrest against the arrestee's Fourth Amendment rights, we "must evaluate a number of factors, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer[] or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Lee*, 284 F.3d at 1197-98 (quoting *Graham*, 490 U.S. at 396). "*Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably

---

[10] Mr. Glasscox does not dispute that Officer Moses had probable cause to arrest him.

proportionate to the need for that force." *Id.* at 1198. In deciding whether the officer's force is excessive, we also consider as relevant the nature and extent of the arrestee's injuries. *Id.*

Under the summary judgment standard, Mr. Glasscox has made a sufficient showing that the force Officer Moses applied in repeatedly tasing him was excessive under the circumstances. We consider the *Graham* factors out of turn, addressing first the most important factor in determining whether the force used was justified; that is, whether Mr. Glasscox was actively resisting or attempting to evade arrest. The evidence, taken in the light most favorable to Mr. Glasscox, shows that he offered no resistance after the second use of the taser. We then examine the remaining factors—the severity of the crime at issue, whether Mr. Glasscox posed an immediate safety threat, and the nature and extent of Mr. Glasscox's injuries—and explain why we balance the factors in Mr. Glasscox's favor. When we apply the *Graham* test to the facts and circumstances here, we conclude a jury could find that the force Officer Moses used in repeatedly tasing Mr. Glasscox was not reasonably proportionate to the need for that force; thus, it was excessive.

"The critical time period for purposes of determining whether" the repeated use of a taser on an arrestee "constituted unconstitutional excessive force spans . . . just before the first activation . . . through . . . the time of the [final] [t]aser

13

deployment." *Wate v. Kubler*, 839 F.3d 1012, 1020 (11th Cir. 2016). Even if the arrestee's resistance justified deployment of a taser initially, if he has "stopped resisting . . . during this time period," further taser deployments are excessive. *Id.*; *see id.* at 1021 ("Construing the evidence in favor of Plaintiff, the unambiguous facts are that [he] was no longer resisting at least after the first two tasings, and that [the officer's] further use of the [t]aser was wholly unnecessary and grossly disproportionate to the circumstances."). Construed in Mr. Glasscox's favor, the evidence shows that he offered no resistance at least after the second tasing, making Officer Moses's further use of the taser excessive under the circumstances.

In the time spanning the second to fourth tasings, Mr. Glasscox did nothing that reasonably could be viewed as resistance. During the second taser shock, Mr. Glasscox's movements were entirely involuntary: his hands and arms curled up toward his chest while he shook and writhed. Then, mere seconds after the second shock ended, without giving Mr. Glasscox time to get out of the truck Officer Moses tased him a third time. During this third shock and immediately following, Mr. Glasscox insisted that he would get out of the car, but Officer Moses gave him no more than two seconds to do so before tasing him a fourth time.

Officer Moses contends that when he touched the taser directly to Mr. Glasscox's leg after the third taser shock, Mr. Glasscox offered resistance by attempting to pull the taser off his leg. From this, Officer Moses argues that the

14

fourth shock was justified.  Even if we accepted that Mr. Glasscox's attempt to pull the taser off of his thigh was an act of resistance rather than an involuntary response to a painful stimulus, however, this act would not support Officer Moses's argument.  The video shows that Mr. Glasscox grabbed the taser *after* the fourth shock began.  Any resistance offered after the use of force is irrelevant to the reasonableness of the force employed.  *See Saucier v. Katz*, 533 U.S. 194, 206-07 (2001) (explaining that excessive force claims must be evaluated for objective reasonableness based on the information officers have at the moment the force is applied), *receded from on other grounds in Pearson v. Callahan*, 555 U.S. 223 (2009).

All of the relevant circumstances, including the very brief time—mere seconds—between taser deployments; the nature of Mr. Glasscox's movements, which were involuntary responses to the taser shock; and Mr. Glasscox's expression of his intent to comply by repeatedly saying "I will" in response to Officer Moses's commands to get out of the truck indicate that rather than resisting Mr. Glasscox was attempting to comply but was continuously thwarted by Officer Moses's repeated tasings, delivered in rapid succession.  Because a reasonable jury could conclude that Officer Moses's own actions appear to have been preventing Mr. Glasscox from complying, we reject his suggestion that Mr. Glasscox "made no discernible, physical moves to get out of his vehicle" and therefore additional

15

force was justified. Appellants' Br. at 16. A jury reasonably could infer that Mr. Glasscox made no such moves because Officer Moses never gave him enough time between taser shocks. So the first *Graham* factor—Mr. Glasscox's lack of resistance—weighs heavily against Officer Moses.

The next factor, the severity of the crime in question, favors Officer Moses. Mr. Glasscox eluded the police vehicle, with its emergency lights and sirens activated, for more than five miles driving at a speed of more than 80 miles per hour, more than 10 miles per hour over the posted speed limit. Based on what appeared to be reckless, dangerous, and elusive driving by Mr. Glasscox, Officer Moses undeniably was justified in using force to make an arrest. The problem for Officer Moses is that the repeated taser shocks—issued after Mr. Glasscox ceased driving recklessly and eluding law enforcement—were objectively unreasonable because at this stage we cannot say that Mr. Glasscox was resisting arrest, at the latest, after the second taser shock. The severity of the crime therefore carries little weight for Officer Moses's *repeated* deployments of his taser. After the second taser deployment, Mr. Glasscox was no longer engaged in any dangerous or violent behavior justifying repeated use of the taser.

The next factor, whether Mr. Glasscox posed an immediate safety threat to Officer Moses or others, slightly favors Mr. Glasscox. Again, we focus on the repeated taser shocks. Mr. Glasscox's truck had stopped when Officer Moses

16

approached.  The parties dispute whether the truck was still running, but a jury reasonably could infer that it was not:  the video reveals that during the repeated taser shocks Mr. Glasscox's feet moved, but the truck never did, and when Mr. Glasscox exited the truck, neither he nor Officer Moses turned off the ignition.  So by that point there was no ongoing pursuit or objective threat of flight necessitating the use of force.

Officer Moses argues that throughout his interaction with Mr. Glasscox the cars passing at high speeds in the northbound fast lane posed an immediate threat to his safety.  True enough, and this fact may very well have justified an initial taser shock.  But once Mr. Glasscox ceased any resistance, the continuing threat from proximity to the highway cannot be attributed to Mr. Glasscox.  Rather, a reasonable jury could find it was Officer Moses's repeated firing of his taser that prevented Mr. Glasscox, who was by then attempting to comply, from exiting the truck so that the two men could move to a safer position.

Officer Moses also argues that he administered the first taser shock because Mr. Glasscox moved his right hand out of view, creating a threat that he might have been reaching for a weapon.  But by Officer Moses's own account, any such threat disappeared after the first shock:  Officer Moses testified that he could see both of Mr. Glasscox's hands throughout the remainder of their interaction.  The

17

video clearly bears this out.  So Mr. Glasscox's hand movements did not create a threat that would justify Officer Moses's repeated use of the taser.

The final factor, the nature and extent of Mr. Glasscox's injuries, also favors Mr. Glasscox.  Officer Moses argues that Mr. Glasscox's injuries were "minimal," so this *Graham* factor weighs in his favor.  But Officer Moses reported that immediately after the multiple taser shocks, Mr. Glasscox was "bleeding all over the place," Doc. 19-1, Ex. A at 6:11-6:13, and Mr. Glasscox's treating physician testified that he suffered psychological injury, including possible Post Traumatic Stress Disorder.  Given that Mr. Glasscox suffered both physical and psychological injuries, we cannot agree that this *Graham* factor favors Officer Moses.

Applying the *Graham* factors to the evidence viewed in Mr. Glasscox's favor yields only one possible conclusion:  that he was no longer resisting at least after the second taser shock and was attempting to comply with commands; thus, Officer Moses's repeated firing of his taser, which caused Mr. Glasscox injury, "was wholly unnecessary, and grossly disproportionate to the circumstances." *Wate*, 839 F.3d at 1021.  As our precedent makes clear, "[t]he use of a taser beyond the arrestee's complete physical capitulation repeatedly in a short period where an arrestee was mostly cooperative and made no attempt to flee would be excessive."  *Manners*, 891 F.3d at 974 (alteration adopted) (internal quotation marks omitted).  This is such a case.  Mr. Glasscox stopped his truck; turned it off;

18

held his hands where Officer Moses could see them; removed his seatbelt at the officer's command; at least after the second taser shock, made no attempt to resist or flee; and repeatedly voiced his intention to cooperate. Yet Officer Moses tased him again and again. And as to Officer Moses's argument that Mr. Glasscox's failure to get out of the truck quickly put him in danger from nearby traffic, the additional, rapid deployments of the taser under these circumstances only prolonged Officer Moses's exposure to that danger. Under the circumstances as construed in Mr. Glasscox's favor, any reasonable officer in Officer Moses's position would have believed that continued taser shocks were unnecessary; a jury could find that Officer Moses's repeated tasing of Mr. Glasscox amounted to excessive force. *See Lee*, 284 F.3d at 1197 (noting that reasonableness of use of force depends on "whether a reasonable officer would believe that this level of force is necessary in the situation at hand" (internal quotation marks omitted)).[11]

Having concluded that Mr. Glasscox has at this stage shown that Officer Moses used excessive force under the circumstances, we address whether a reasonable officer in Officer Moses's circumstances would have had fair warning

---

[11] The caselaw Officer Moses cites to support his argument that the force he used was reasonable does not persuade us. Each of the cases he cites is materially different from this one, either because the defendant law enforcement officer deployed the taser only once or because the plaintiff resisted arrest even after an initial taser shock or shocks. *See, e.g.*, *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347 (11th Cir. 2015) (arrestee refused to surrender despite the use of force, including an initial taser shock); *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004) (officer effected arrest after one taser shock); *Anthony v. Coffee Cty.*, 579 F. App'x 760 (11th Cir. 2014) (unpublished) (non-binding opinion in which officer effected arrest after one taser shock).

that repeatedly deploying his taser, when Mr. Glasscox was not resisting and was attempting to comply with the officer's commands, was unconstitutionally excessive.

## B.    Clearly Established Law Demonstrated that Officer Moses's Conduct Was Unconstitutional.

Officer Moses argues that even if he used excessive force, he did not violate clearly established law.  Specifically, he contends that the district court was wrong to rely on *Oliver v. Fiornio*, 586 F.3d 898 (11th Cir. 2009), as clearly establishing the violation Mr. Glasscox alleges.  We agree that *Oliver* alone does not clearly establish that the force Officer Moses used was excessive, but we disagree that the law was not clearly established.[12]

To determine whether a right was clearly established, we look to binding decisions of the Supreme Court of the United States, this Court, and the highest court of the relevant state (here, Florida).  *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).  We ask whether it would be "sufficiently clear that every reasonable official would understand that what he is doing is unlawful," *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted), "'in light of the specific context of the case, not as a broad general proposition,'" *Lee*, 284 F.3d at 1194 (quoting *Saucier*, 533 U.S. at 201).

---

[12] "[W]e may affirm for any reason supported by the record, even if not relied upon by the district court." *United States v. Al-Arian*, 514 F.3d 1184, 1189 (11th Cir. 2008) (internal quotation marks omitted).

To be clearly established, a legal principle must be "settled law," meaning that it is not merely suggested, but rather "is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Wesby*, 138 S. Ct. at 589-90 (internal quotation marks omitted). What's more, a rule must be specific enough that the officer's unlawfulness "follow[s] immediately from the conclusion that the rule was firmly established." *Id.* at 590 (alteration adopted) (internal quotation marks omitted). The Supreme Court has "stressed that the specificity of the rule is especially important in the Fourth Amendment context." *Id.* (internal quotation marks omitted). This means that officers are not required to be "creative or imaginative in drawing analogies from previously decided cases." *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002) (internal quotation marks omitted). The crucial question here is whether the state of the law gave police officers "fair warning" that their conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

"[T]he rule requiring particularized case law to establish clearly the law in excessive force cases" has "[a] narrow exception," *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000), known as the "obvious clarity" rule, *Oliver*, 586 F.3d at 907. Under this rule, "an excessive-force plaintiff can overcome qualified immunity only by showing that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the

unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw" on point. *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997). "To come within the narrow exception, a plaintiff must show that the official's conduct 'was so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution even without caselaw on point.'" *Priester*, 208 F.3d at 926 (alteration adopted) (quoting *Smith*, 127 F.3d at 1419). "This test entails determining whether application of the excessive force standard would inevitably lead every reasonable officer in the Defendants' position to conclude the force was unlawful." *Id.* at 926-27 (alterations adopted) (internal quotation marks omitted).

With these principles in mind, we conclude that it was clearly established on the date of Mr. Glasscox's arrest that the repeated tasing of a suspect who had ceased any resistance was unlawful. *See Oliver*, 586 F.3d at 898; *Smith*, 127 F.3d at 1416. *Oliver* and *Smith* together dictate this result. We address these authorities in turn.

*Oliver* clearly established that administering multiple taser shocks can amount to excessive force. A patrolling police officer encountered Mr. Oliver in the median of a roadway, waving his arms in an attempt to flag the officer down. 586 F.3d at 901. The officer stopped and exited her car and began speaking with Mr. Oliver, who was standing several feet away. *Id.* at 901-02. Mr. Oliver told the

22

officer that someone had been trying to shoot him, and she called for backup. *Id.* at 902. A backup officer arrived and attempted to move Mr. Oliver from the median, but Mr. Oliver "struggled and pulled away from him" and "attempted to walk away." *Id.* Without warning, the first officer tased Mr. Oliver. *Id.* The taser shock brought Mr. Oliver to the ground. *Id.* at 903. "[O]nce [Mr.] Oliver was on the pavement after the first tase, he never got back up, and he never hit, kicked, punched, or threatened the officers." *Id.* Nevertheless, three to four seconds after the first shock ended, the officer tased Mr. Oliver again. *Id.* Ten seconds after the end of this second shock, she tased him for the third time. *Id.* After this third shock, Mr. Oliver screamed that the pavement was "too hot." *Id.* He attempted to sit up and get off the ground. *Id.* The officer continued to shock Mr. Oliver, and after no fewer than eight shocks, he was lying flat and did not get up. *Id.* Mr. Oliver died 19 days later as a result of his injuries. *Id.* at 901, 904.

We affirmed the denial of the officer's motion for summary judgment. Although we accepted that the initial use of the taser may have been justified, there was no justification for further taser shocks under the circumstances; namely, that Mr. Oliver was not accused of a crime or threatened with arrest or apprehension, posed no immediate threat of danger to the officers beyond the moment of struggle before the first shock, and was "largely compliant and cooperative" when the force was deployed. *Id.* at 906. We then explained that this constitutional violation was

23

clearly established. Even though no decision from the United States Supreme Court, this Court, or Florida Supreme Court had clearly established that an officer's repeated use of a taser constituted excessive force under circumstances like those confronting the officer, we held that "the force employed was so utterly disproportionate to the level of force reasonably necessary that any reasonable officer would have recognized that his actions were unlawful." *Id.* at 907-08.

We agree with Officer Moses that the facts of *Oliver* are distinct enough that standing alone it did not clearly establish the violation here. Mr. Oliver was suspected of no criminal conduct and at no point posed any threat to the officers. The *Smith* case clearly established, though, that an officer's use of substantial force in subduing an arrestee once the arrestee has submitted to the officer and ceased any resistance or threatening behavior is excessive.

In *Smith*, officers received a tip that some men at a picnic in a front yard possessed cocaine. 127 F.3d at 1417. Officers stopped at the house, which belonged to Mr. Smith's mother, to investigate. *Id.* When an officer entered the front yard where Mr. Smith was sitting, Mr. Smith raised a baseball bat "in a threatening posture." *Id.* at 1417-18. After initially refusing an order by the officer, who had his gun drawn, to drop the bat, Mr. Smith dropped the bat and ran through the backyard and into a street behind his mother's house. *Id.* at 1418. Thinking the police had gone, Mr. Smith turned around to go back to the house and

24

found himself face to face with the officer. *Id.* "After first pretending to run again, [Mr.] Smith docilely submitted to arrest upon [the officer's] request for him to 'get down.'" *Id.* Once on the ground, the officer put his knee on Mr. Smith's back and pulled his left arm behind his back to place Mr. Smith in handcuffs. *Id.* When Mr. Smith cried out in pain, the officer broke Mr. Smith's arm. *Id.* Mr. Smith was not yet in handcuffs when the officer applied this force.

We affirmed the denial of the officer's motion for summary judgment based on qualified immunity. *Id.* at 1417. We held that it was obviously clear to any reasonable officer—and therefore clearly established—that a police officer's use of force on a "previously threatening" arrestee after the arrestee ceased any resistance was excessive. *Id.* at 1419-20.

In light of this clearly established law, no objectively reasonable officer in Officer Moses's position could have thought it was lawful to use a taser repeatedly on an arrestee who was not resisting, even if that arrestee had previously offered resistance and was not yet restrained. *Oliver* settled any question whether repeated taser deployment could constitute excessive force even if an earlier deployment was justified. And *Smith* removed any doubt that an officer's use of substantial force on an arrestee who, although not yet restrained, had ceased any resistance or threatening behavior, is excessive. Together, *Smith* and *Oliver* clearly establish

25

that the repeated tasing of a subdued arrestee who has ceased any resistance or threatening conduct is excessive force in violation of the Fourth Amendment.

Alternatively, under the unusual circumstances of this case, it would be obviously clear to any reasonable officer that the display of force was excessive. It is clear from precedent that "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008). "We have repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." *Saunders*, 766 F.3d at 1265 (citing cases decided before Mr. Glasscox's arrest, including one, *Priester*, in which the suspect was subdued but not restrained). Accepting the evidence in the light most favorable to Mr. Glasscox, we conclude that, because Officer Moses used gratuitous and excessive force on an arrestee who was not resisting arrest, "no particularized preexisting case law was necessary for it to be clearly established that what [Officer Moses] did violated [Mr. Glasscox's] constitutional right to be free from the excessive use of force." *Priester*, 208 F.3d at 927; *see also Oliver*, 586 F.3d at 908 (holding that the facts of the plaintiff's case fell within the obvious clarity rule); *Smith*, 127 F.3d at 1420 (same).

26

## IV.    CONCLUSION

Officer Moses may have been justified in deploying his taser to subdue Mr. Glasscox, who had just led him on a high speed chase for several miles on the interstate.  But instead of using the taser on Mr. Glasscox and then giving him time to respond to orders, Officer Moses issued repeated taser shocks in rapid succession.  Mr. Glasscox, helpless to comply or stop the taser shocks, cried out and writhed in pain and during the brief intervals between shocks told the officer that he would comply.  We hold, viewing the evidence in the light most favorable to Mr. Glasscox, that Officer Moses's repeated deployment of the taser amounted to excessive force prohibited by the Fourth Amendment.  Because our law clearly established that such a use of force was excessive, the district court properly denied qualified immunity.

We affirm the district court's denial of summary judgment to Officer Moses and the City.

**AFFIRMED.**