[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-12389
_____

D.C. Docket No. 3:17-cv-00165-MCR-EMT


AMELIE SIMMONS,

Plaintiff - Appellant,

versus

WILLIAM B. HENGHOLD, M.D., P.A.,
WILLIAM B. HENGHOLD, and
MICHELLE K. HENGHOLD,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(February 27, 2020)

Before MARTIN, ROSENBAUM, and BOGGS,[*] Circuit Judges.

PER CURIAM:

Plaintiff Amelie Simmons sued her former employers, William B. Henghold M.D., P.A. ("Henghold P.A."), Dr. William Henghold, and Mrs. Michelle Henghold, for alleged violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654, as well as for alleged violations of state law.  The district court granted the Defendants' motion for summary judgment on Simmons's FMLA claims and remanded her state-law claims to Florida state court.  This appeal followed.  For the reasons we discuss below, we vacate the district court's judgment and remand the case for further proceedings.

## I.      Factual Background[1]

A. Simmons's Tenure as Director of Nursing

Defendant Henghold P.A. is a dermatology practice that is headquartered in Pensacola, Florida.  Its facilities include an Ambulatory Surgical Center, a Medical Office Building, and another building located in Gulf Breeze, Florida.  Defendant

---

[*] Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by designation.

[1] This summary is derived primarily from depositions that were taken during discovery. We offer no commentary on the veracity or plausibility of these facts.  That task is for the fact finder on remand.  *See Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996) ("[W]hat is considered to be the 'facts' at the summary judgment stage may not turn out to be the actual facts if the case goes to trial, but those are the facts at this stage of the proceeding for summary judgment purposes.") (citations omitted).

Dr. Henghold is the practice's owner and founder, and his wife, Defendant Mrs. Henghold, is the practice's Chief Financial Officer.

Henghold P.A. hired Simmons in April 2009 as a registered nurse.  Simmons worked at Henghold P.A. until March 2017, though her position and responsibilities changed during her employment.  Simmons was initially responsible for surgical work, such as preparing patients for surgery, taking vital signs and entering medical history, scheduling surgery, and discharging patients.

Henghold P.A. expanded during Simmons's tenure.  Dr. Henghold was the only physician when Simmons started.  The practice added several medical providers in 2015 and 2016, and in May 2015, Simmons was promoted to Director of Nursing.  Simmons retained her surgical nursing duties, but as the Director of Nursing, she also held numerous administrative responsibilities.  According to Simmons, these included (i) hiring and managing Henghold P.A.'s nursing staff, *Simmons v. William B. Henghold M.D., P.A., et al.*, Case No. 3:17-cv-00165-MCR-EMT (N.D. Fla.), ECF No.[2] 27-1 at 45, 66; (ii) creating educational materials for Henghold P.A.'s physicians and staff, *id.* at 66–67; (iii) managing inventory and supplies, *id.* at 69; and (iv) ensuring that Henghold P.A. complied with certain federal regulations, *id.* at 48, 66.

---

[2] Citations to "ECF No." in this opinion are citations to the electronic case-filing numbers listed in the docket sheet of *Simmons v. William B. Henghold M.D., P.A., et al.*, Case No. 3:17-cv-00165-MCR-EMT (N.D. Fla.) (May 14, 2018).

Simmons asked Henghold P.A. for a raise in the fall of 2016.  The practice gave it to her.  The memo accompanying that raise, dated September 1, 2016, listed Simmons's professional responsibilities, which included "managing all medical (non-physician & midlevel) personnel for both the [Ambulatory Surgical Center] and the Professional Association . . . .[including] hiring, firing, scheduling and managing all medical staff, assuring both entities are compliant for OSHA regulations and assuring providers meet all PQRS/Meaningful Use guidelines. [Simmons's] duties for the [Ambulatory Surgical Center] include[d] all managerial duties and assuring continued accreditation of the [Ambulatory Surgical Center]."[3] ECF No. 27-5 at 31.

Simmons's performance review three months later suggests that her supervisors thought that her raise was well-earned.  Henghold P.A.'s Chief Executive Officer, Cynthia Huss, wrote that Simmons had "exceeded expectations," notwithstanding "all the responsibilities given to" her.  ECF No. 27-5 at 6.  And out of 62 categories, Huss scored Simmons with 55 "tens" (out of ten); the scores for the other seven categories were six "nines" and one "eight."  *Id.* at 6–10.

At some point in the fall of 2016, Dr. Henghold and Huss purportedly discussed bringing on a full-time administrator.  Henghold P.A. had grown

---

[3] Cynthia Huss testified that the "professional association" referred to all of Henghold P.A.'s facilities aside from the Ambulatory Surgical Center.  ECF No. 27-4 at 72.

significantly, and management was concerned that Simmons would be unable to handle additional administrative work and her nursing responsibilities. Dr. Henghold testified at his deposition that he was worried that "things were starting to slip a bit from an administrative standpoint" on Simmons's watch. ECF No. 27-6 at 33. This is at odds with Simmons's recollection: she testified at her deposition that she could complete her Director-of-Nursing responsibilities in less than 40 hours a week, though her nursing responsibilities meant that she worked about 60 hours each week over four days. In any event, Simmons was unaware in the fall of 2016 that Dr. Henghold and Huss had considered bringing on additional administrative support.

B. Simmons's Leave of Absence

At some point during her employment at Henghold P.A., Simmons and Dr. Henghold began an extramarital affair that lasted for about three years. Simmons learned in January 2017 that Dr. Henghold was simultaneously having an affair with another staff member.

Simmons's relationship with Dr. Henghold quickly fell apart after that revelation, though Dr. Henghold did assure Simmons that her job was "secure." Huss spoke with Simmons several times during the week of January 15, 2017, after the affair was revealed, about Simmons's future at the practice. There is some disagreement in their respective accounts that is relevant to Simmons's state-law

5

claims—for example, Simmons and Huss discussed Simmons's release of Henghold P.A. from liability in exchange for a payout, but the parties dispute whether an agreement was ever reached—but what is relevant to our review is that Simmons and Huss agreed that Simmons would take a leave of absence.

The record suggests that Huss did not believe that Simmons would want to return to the practice. According to Simmons, Huss told her that Simmons would not "want to go back [to Henghold P.A.] . . . . You don't need to be in that type of environment." ECF No. 27-2 at 26. And Huss testified that Simmons told her that Simmons "didn't want anything to do with the Henghold practice anymore." ECF No. 27-4 at 24.

### C. Henghold P.A. Hires a New Director of Nursing

On January 16, 2017, shortly after Huss first reached out to Simmons, Huss directed Henghold P.A.'s Human Resources and Marketing Coordinator to post openings for a new Director of Nursing. Huss separately reached out to a former colleague, Tracey Soule, about joining Henghold P.A. Soule interviewed for the job towards the end of January 2017 and was offered the position of "Director of the [Ambulatory Surgical Center] & Nursing." She started on March 6, 2017.

The record contains some inconsistencies about why Soule was hired. Dr. Henghold indicated that Soule was brought on to fill a much-needed full-time administrative post and was adamant that she never held the title of "director of

6

nursing."[4]   ECF No. 27-6 at 32–33, 56.   Huss's testimony, on the other hand, suggests that she thought hiring Soule was necessary because she was concerned that Simmons was not coming back.  Huss testified that she reached out to Soule after "[Simmons] told me she was not coming back to be any part of anything with the Henghold name." ECF No. 27-4 at 17.  Huss further acknowledged that Soule was officially hired as the "director of nursing."  *Id.* at 19–20.  And Soule testified that, before she took the job, Huss had told her that Henghold P.A. was looking for a "director of nursing" and that the former director of nursing "left for personal reasons and . . . had decided to be a stay-at-home mom." ECF No. 27-7 at 10, 12–13.  Soule added that she was "a little surprised" when she learned Simmons might be returning to Henghold P.A., as she was told during her interview that Simmons "didn't want to come back or have anything to do with the practice." *Id.* at 58–59.

At some point in mid-March 2017 Soule was promoted to Henghold P.A.'s Chief Nursing Officer.  When asked why Henghold P.A. had not hired a chief nursing officer in 2016, when Huss and Henghold first discussed employing a full-time administrator, Huss testified that they were "working on that," and that she was "trying to put the building blocks in to show that [she] needed that level [of full-time administrator]." ECF No. 27-4 at 53–54.

---

[4] Henghold testified that he did not know that his practice had posted openings for a director-of-nursing position until he was shown the postings at his deposition. ECF No. 27-6 at 26.

Chief Nursing Officer was a new position for Henghold P.A., and its internal description wasn't created until March 2017 when Huss and Soule were discussing changing Soule's job title.  Dr. Henghold testified that the chief nursing officer was "in charge of all nursing operations for the entire organization."  ECF No. 27-6 at 44.  Huss likewise testified that the position was responsible for overseeing the practice's clinics and their personnel.  ECF No. 27-4 at 49–50.  And according to Soule, the chief nursing officer's responsibilities included (i) clinical hiring and staffing of Henghold P.A.'s branches, ECF No. 27-7 at 36, 38; (ii) staff education and development, and ensuring that licensures are current, *id.* at 36; (iii) oversight of the practice's inventory, *id.* at 37; and (iv) regulatory compliance at the local, state, and federal level for the ASC and the clinics, *id.* at 36–37.

D. Simmons's FMLA Leave

Meanwhile, Simmons was still employed by Henghold P.A. during the period between Soule's agreement to join Henghold P.A. (January 2017) and Soule's start date (March 2017).  On February 7, 2017, amidst discussions about severance from the practice, counsel for Henghold P.A. informed Simmons's counsel that the Defendants expected Simmons to return to work on February 20, 2017, or else the Defendants would assume that Simmons had resigned.

A week later, on February 14, 2017, Simmons's counsel replied that Simmons was not resigning and had no plans to do so.  To the contrary, Simmons's counsel

8

stated that she was still on indefinite leave "to address the mental anguish and anxiety resulting from the situation with Dr. Henghold," and counsel asserted Defendants' attempts to rush Simmons back were in violation of the FMLA. Defense counsel replied later that day that Simmons's counsel's email was "the first indication that the practice has received to suggest that Ms. Simmons is possibly suffering from a 'serious health condition' that would implicate the FMLA."

The parties spent the next month exchanging the requisite FMLA paperwork, and on March 10, 2017, Simmons's counsel informed Henghold P.A.'s counsel that Simmons was ready to return to work. In that email, Simmons's counsel also requested information about Simmons's duties and responsibilities when she returned. Simmons was asking similar questions of Huss around this time, and Huss texted Simmons that Henghold P.A. had "hired a Chief Nursing Officer" but said that Simmons would have the "same schedule & duties" she had before her leave of absence. ECF No. 27-3 at 24–25. This text occurred around the same time that Soule was promoted to serve as the chief nursing officer. The record does not reveal the precise date of Soule's promotion, but Soule testified that it was sometime between March 6 and March 20, 2017. ECF No. 27-7 at 21.[5]

---

[5] Huss provided Soule with a job description of the chief-nursing-officer position that was dated March 6, 2017, the date that Soule started working. Both Huss and Soule testified, though, that the form had been backdated and the promotion had come later. ECF No. 27-4 at 49; ECF No. 27-7 at 26.

On March 27, 2017, Simmons met with Huss, Soule, and Dr. Elias Ayli (who was filling in for Dr. Henghold as Henghold P.A.'s president while Dr. Henghold was on leave, to discuss Simmons's return to the practice. There are multiple, inconsistent accounts of the meeting. According to Simmons, Huss said at that meeting that Soule "was strictly in charge of all nursing responsibilities," which Simmons said was her "number one job description." ECF No. 27-2 at 85. But according to notes that Huss made about the meeting, Huss told Simmons that "she was still the [director of nursing]" and had the same responsibilities as before, and that "the only change was that she would report to [Soule], not [Huss]." ECF No. 27-7 at 76.

Soule testified that she and Huss never discussed the work that Simmons would have done if she had returned to Henghold P.A., or how she and Simmons would have divided up overlapping responsibilities. ECF No. 27-7 at 49–54. Soule also testified that she understood that Simmons would have reported to her and that Soule would have decided which responsibilities to keep and which ones to delegate to Simmons. *Id.* at 54–55. That is consistent with Simmons's understanding, which was that Soule would have given Simmons her duties each day. ECF No. 27-2 at 81.

The March 27 meeting lasted about twenty minutes. A few hours after the meeting ended, Simmons resigned in a text message to Huss. Simmons said that it

was "clear from our discussion that my job responsibilities and duties have substantially changed from before I took FMLA leave" and expressed concern that she would be "subject to a hostile work environment" if she returned.  ECF No. 27-3 at 32.

Henghold P.A. continued to grow, albeit not for several months after Simmons left.  Soule hired several new staff members; the first was hired in June or July 2017.  And by August 2017, the practice had agreed to bring on one more provider and transition a newly hired part-time provider to full-time.  One of those providers was scheduled to begin working full-time in October 2017, and the other was scheduled to begin at some point in 2018 or 2019.  **Procedural History**

Simmons sued Henghold P.A. in Florida state court on February 14, 2017, alleging multiple state-law causes of action.  The next day, Simmons filed an amended complaint that added Dr. Henghold and Mrs. Henghold as defendants and added her claim that the Defendants violated the FMLA.  The Defendants removed the case to federal court on March 13, 2017, and moved for summary judgment on December 4, 2017.  The district court granted the Defendants' motion in part on May 14, 2018, and dismissed Simmons's FMLA claim.  *See Simmons v. Henghold, M.D., P.A., et al.*, No. 3:17-cv-00165-MCR-EMT, 2018 WL 3414475, at *6–8 (N.D. Fla. May 14, 2018).  Because Simmons's FMLA claim was the only basis for federal jurisdiction, the district court remanded Simmons's state-law claims to Florida state

court without further discussion. *See id.* at \*9. Simmons timely appealed that decision.

## II.    <u>Standard of Review</u>

We review *de novo* a district court's grant of summary judgment, using the same legal standard as the district court. *See Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005). Summary judgment is proper if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (en banc) (citation omitted). However, "[c]onclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Glasscox v. Argo, City of*, 903 F.3d 1207, 1213 (11th Cir. 2018) (citation omitted).

In considering a motion for summary judgment, we must draw all factual inferences from the evidence in favor of the non-moving party. *See Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000) (citations omitted). We do not make credibility determinations or weigh conflicting evidence; that is the jury's responsibility. *See id.* (citation omitted). Our task is simpler: we must merely

"determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III.    Discussion

### A. The Family and Medical Leave Act

The FMLA ensures that eligible employees can take up to twelve weeks of unpaid leave for, among other things, serious medical conditions. 29 U.S.C. § 2612(a)(1)(D). Following a period of FMLA leave, an employee has the right to return to her job and "be restored by the employer to the position of employment held by the employee when the leave commenced," or to an equivalent position. *Id.* at § 2614(a)(1)(A). An "equivalent position" is "one that is virtually identical" to the prior position in terms of pay, benefits, and working conditions. 29 C.F.R. § 825.215(a). It also "must involve the same or substantially similar *duties and responsibilities*." *Id.* (emphasis added).

The FMLA creates a private right of action that enables an employee to sue her employer if the employer interferes with her FMLA rights. *See White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015); *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006). "To prove FMLA interference, an employee must demonstrate that [s]he was denied a benefit to which [s]he was entitled under the FMLA." *Martin v. Brevard Cty. Pub. Schs.*, 543 F.3d 1261, 1266–67 (11th Cir. 2008) (citations omitted); *see also* 29 U.S.C. § 2615(a)(1).

13

An employee does not need to allege that the employer intended to deprive the employee of her FMLA rights; "the employer's motives are irrelevant." *Strickland v. Water Works and Sewer Bd. of Birmingham*, 239 F.3d 1199, 1208 (11th Cir. 2001).

Simmons's interference claim therefore has two elements: she must establish by a preponderance of the evidence that (i) she was entitled to a benefit under the FMLA; and (ii) that her employer denied her that benefit. *See White*, 789 F.3d at 1191 (citation omitted); *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010) (citation omitted). The parties do not dispute that Simmons was entitled to a benefit. What is at issue is whether the Defendants denied that benefit to her. More specifically, the parties contest whether Simmons returned to an equivalent position at Henghold P.A. following her FMLA leave.[6] The district court concluded that she had. After careful review of the record and with the benefit of oral argument, we reverse.

B. Simmons's FMLA Interference Claim

Simmons has presented evidence that she was not restored to an equivalent position when she returned from FMLA leave. Her deposition testimony and

---

[6] Simmons argued in the proceedings below that the Defendants had interfered with her FMLA rights by failing to inform her of her FMLA rights prior to February 2017. *See Simmons*, 2018 WL 3414475, at *5. The district court rejected this because there was "no dispute that Simmons received all the leave she requested." *Id.* at *7. Simmons does not appeal this part of the district court's decision. Simmons also does not appeal the district court's conclusion that she abandoned several other theories of FMLA interference—which were raised in her amended complaint—by failing to brief them. *See id.* at *5 n.18.

14

Soule's deposition testimony indicate that Soule, as the practice's chief nursing officer, took over some of Simmons's prior director-of-nursing responsibilities. For example, Simmons testified that she had been responsible for managing Henghold P.A.'s nurses. Yet when Simmons was to return, Soule had been placed in charge of that duty. Simmons had created education materials for physicians and staff, but again, Soule was charged with that responsibility. Simmons previously oversaw management of the practice's inventory, but Soule was assigned that task. And similarly, Simmons had been responsible for ensuring that Henghold P.A. was compliant with federal regulations, but that became Soule's job.

The Defendants argue that Simmons's arguments are rooted in speculation. They submit that Soule's testimony about her responsibilities came after Simmons abruptly quit the practice and that Simmons would have retained most of her former duties if she had stayed. *See Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (quoting *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995)).

We find no merit to this argument. While Simmons's abrupt resignation from Henghold P.A. leaves some uncertainty as to her role at the practice, the record reveals that her claims are based on more than speculation and guesswork. Soule testified that she thought that she and Simmons would have done similar work if

15

Simmons had come back, but Soule would have done the work "at a different level" than Simmons and "would have been doing higher level responsibilities." ECF No. 27-7 at 58. And even though Soule testified that she and Huss never discussed how Soule and Simmons would have split up various responsibilities—such as managing Henghold P.A.'s nurses, creating education materials, overseeing inventory, and ensuring adherence to regulatory requirements—Soule testified that she understood that she would have picked the tasks she wanted to do and "would have delegated [other responsibilities] to [Simmons]." *Id.* at 54–55. On its face, the described position is different from Simmons's position before she took FMLA leave, where, according to Simmons's testimony, she was responsible for all of those duties.

The contemporaneous evidence Simmons offers further supports this conclusion. The record contains Henghold P.A.'s internal job descriptions for the director-of-nursing and chief-nursing-officer positions. Some differences exist between the positions, but there is material overlap. For example, the director-of-nursing job description states that the position is responsible for "assur[ing] compliance with all Clinic policies and procedures and governmental regulations" and "[s]elect[ing] and hir[ing] employees according to established guidelines." *Id.* at 71. Similarly, the September 1, 2016, memo that accompanied Simmons's bonus stated that Simmons was responsible for "hiring, firing, scheduling and managing all medical staff" and assuring compliance with "OSHA regulations and assuring

16

providers meet all PQRS/Meaningful Use guidelines." ECF No. 27-5 at 31. But the chief-nursing-officer job description likewise reflects that the practice's chief nursing officer is responsible for "[m]aintain[ing] regulatory and compliance approvals and accreditations" and is "involved in nurse recruitment, training, and retention." ECF No. 27-7 at 69.

Because Simmons raises evidence from which a reasonable jury could conclude that she returned to a position after her FMLA leave that was not equivalent to her former job, this claim cannot be resolved at the summary-judgment stage.

C. Henghold P.A.'s Affirmative Defense

The district court granted Henghold P.A.'s summary-judgment motion for an additional, alternative reason: it found that the practice could "prove it would have made the same decision had the employee not exercised [her] FMLA rights." *Simmons*, 2018 WL 3414475, at *8 (quoting *Blakley v. Schlumberger Tech. Corp.*, 648 F.3d 921, 934 (8th Cir. 2011)). We disagree.

The district court correctly described the limits of Simmons's rights under the FMLA. Our case law and the FMLA make clear that Simmons's right to reinstatement is not absolute. Henghold P.A. can succeed on its motion if it demonstrates that it would have hired a chief nursing officer, or a similar position, even if Simmons had not taken FMLA leave. *See Strickland*, 239 F.3d at 1208 ("[I]f an employer can show that it refused to reinstate the employee for a reason wholly

17

unrelated to the FMLA leave, the employer is not liable."); *Parris v. Miami Herald Publ'g Co.*, 216 F.3d 1298, 1301 n.1 (11th Cir. 2000) ("[I]f an employer interferes with an employee's right to reinstatement under the FMLA, the employer bears the burden of proving that the employee would have been laid off during the FMLA period for reasons unrelated to the employee's condition, and therefore is not entitled to restoration."); *see also* 29 U.S.C. § 2614(a)(3)(B) ("Nothing in this section shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."); 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period.  An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment.").

But at this stage, this defense fails.  The Defendants claim that Soule was hired because of the practice's growth and the increasing administrative responsibilities. That may be true, but "the record does not establish beyond dispute that [Henghold P.A. would have made this decision] had [Simmons] *not* taken FMLA leave." *Martin*, 543 F.3d at 1267.

Much of Henghold P.A.'s growth took place in 2015 and 2016. By the practice's own measure, Simmons seems to have handled those changes well: the practice rewarded her with a raise, and three months later, she received an overwhelmingly favorable review, which noted that she had "exceeded all expectations." While the Defendants' predictions about Henghold P.A.'s growth ultimately turned out to be accurate, much of that growth came several months (if not more) after Soule became the chief nursing officer.

The uncertainty in the record about why Soule was hired supports this conclusion. If Soule was hired to fill a long-needed administrative role, as Dr. Henghold testified, that would support the Defendants' argument. But if she was hired to replace Simmons as Henghold P.A.'s director of nursing because Huss, Simmons's supervisor, did not think Simmons was coming back to work, that may suggest that Henghold P.A. had not intended to hire another employee at the time.

To be sure, some evidence supports the Defendants' position. Dr. Henghold and Huss had discussed hiring a full-time administrator, and the practice did eventually grow. But in light of the evidence in the record from which a jury could reasonably infer that Soule was hired to replace Simmons, we cannot say that no material dispute of fact exists concerning this issue. In short, though the Defendants' "explanation may ultimately prove true," "a genuine dispute of material fact

19

nonetheless remains." *Martin*, 543 F.3d at 1268.  Accordingly, summary judgment was not appropriate.

## IV.    Conclusion

For the foregoing reasons, we vacate the district court's grant of summary judgment and remand the case for further proceedings.

**VACATED AND REMANDED.**